THE STATE OF OHIO, APPELLEE, v. THOMPSON, APPELLANT.

[Cite as State v. Thompson (1987), 33 Ohio St. 3d 1.]

(No. 85-1301—Decided October 7, 1987.)

2

*Robert L. Becker,* prosecuting attorney, for appellee.

*Gold, Rotatori, Schwartz & Gibbons Co., L.P.A., John S. Pyle, Hendershott, Huffman, Peckinpaugh & Fisher Co., L.P.A., Norman R. Fisher* and *Alan E. Johnson,* for appellant.

*Per Curiam.* The instant appeal presents this court with numerous issues concerning appellant's conviction and the penalty of death which was subsequently imposed. For the reasons discussed *infra,* we affirm the judgment of the court of appeals with regard to appellant's conviction, but reverse the judgment of the court of appeals as to appellant's death sentence.

## I

We begin our analysis by considering appellant's propositions of law which challenge the validity of his conviction for aggravated murder.

In appellant's first proposition of law, he asserts that his conviction must be reversed because the prosecutor improperly commented upon appellant's refusal to testify on his own behalf. Appellant argues that he was materially prejudiced by comments made during the prosecutor's closing argument. We agree that the comments of the prosecutor were improper but do not agree that such comments affected in any material way the *conviction* of the appellant.

In closing argument, the prosecutor made the following statements:

"* * * The only other thing that is missing in this case is a complete and total confession to the crime by the defendant. Why doesn't he tell us what happened and make it easier on himself. He doesn't want to admit the actual killing. * * *

"* * *

"* * * What happened next? He walked back to his own house. Why? Something happen? What did he do, proposition her? She's a good-looking woman. What does he say to her? I don't know * * *. * * * Was he mad? Had he been jilted? Did he decide he really liked the girl? Heaven knows. I don't know and he's not telling us.

"* * *

"* * * I submit that it does not make one bit of difference whether Mr. Thompson remembers tying up Beth or having sex with Beth or having killed her. It doesn't make any difference because we know that he did. *Why isn't he telling us that? What is he trying to tell us? That he had a blackout? Balogna* [*sic*]. Our version is that Mr. Thompson told us as much as he thought he could, but he's going to leave out something because he wanted to bargain. He wanted a deal." (Emphasis added.)

Appellant objected to the prosecutor's comments on two separate occasions. Both objections were sustained. Following the first sustained objection, the court stated, "[h]e's [appellant's] under no obligation to tell anyone. The jury will disregard that completely." Additionally, the court gave the following curative instruction as part of its general charge to the jury:

"The defendant did not testify in this case. It is not necessary that the defendant take the witness stand in his own defense. He has a constitutional right not to testify. The fact that he did not testify must not be considered for any purpose."

The United States Supreme Court in *Griffin* v. *California* (1965), 380 U.S. 609, 32 O.O. 2d 437, held that a prosecutor's comments regarding a defendant's refusal to testify violated the accused's Fifth Amendment right to remain silent. See *State* v. *Lynn* (1966), 5 Ohio St. 2d 106, 34 O.O. 2d 226, 214 N.E. 2d 226. However, in *Chapman* v. *California* (1967), 386 U.S. 18, and more recently in *United States* v. *Hasting* (1983), 461 U.S. 499, the Supreme Court held that the defendant's *conviction* may be affirmed, provided that the comments regarding the defendant's silence are found to be harmless beyond a reasonable doubt. This court has similarly held that if it is "* * * clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty," then the defendant's conviction need not be reversed. *State* v. *Smith* (1984), 14 Ohio St. 3d 13, 15, 14 OBR 317, 319, 470 N.E. 2d 883, 886; see, also, *State* v. *Zimmerman* (1985), 18 Ohio St. 3d 43, 18 OBR 79, 479 N.E. 2d 862, syllabus.

Comments by prosecutors on the post-arrest silence or refusal to testify by defendants have always been looked upon with extreme disfavor because they raise an inference of guilt from a defendant's decision to remain silent.

In effect, such comments penalize a defendant for choosing to exercise a constitutional right. Prosecutors must therefore take care not to equate the defendant's silence to guilt. See *State* v. *Rogers* (1987), 32 Ohio St. 3d 70, 512 N.E. 2d 581. Further, they must be aware that where such comments work to the material prejudice of the defendant, they will not be tolerated. See, *e.g.*, *Wainwright* v. *Greenfield* (1986), 474 U.S. 284; *Doyle* v. *Ohio* (1976), 426 U.S. 610.

Although considerable latitude is permitted the parties in closing argument, the prosecutor's remarks in the case now before us were unquestionably improper.[3] Further, after previously having this line of argument objected to, which objection was *sustained* by the court, the prosecutor proceeded to comment once again on appellant's failure to tell his side of the story. This third comment prompted both an objection, which was again sustained, and a motion for a mistrial, which was overruled.

Notwithstanding the clear impropriety of the prosecutor's comments, there is no doubt that the jury herein would have convicted appellant even if the comments in question had not been made. Appellant's admissions and the other evidence produced leave *no doubt* that appellant was the perpetrator of the crime. Thus, the prosecutor's comments, while highly improper and possibly even subject to a contempt sanction,[4] did not work to the material prejudice of the appellant

---

[3] Appellee insists that the prosecutor's comments were directed not at appellant's silence but, rather, at his refusal, after voluntarily waiving his rights, to tell the police the entire story of what happened at the Hendrens' home. Inasmuch as appellant was constitutionally privileged either to re-

main totally silent after his arrest or to stop talking at any time thereafter, this is a distinction without a difference. In addition, it is unlikely that a lay jury could appreciate such a technical distinction even if it were valid.

[4] Commenting in a case which is similar

in the *guilt phase* of the proceeding. Accordingly, as the prosecutor's comments were harmless beyond a reasonable doubt, appellant's first proposition of law is overruled.

In appellant's second proposition of law, appellant charges that the trial court erred when it failed to grant appellant's motions for a change of venue. We disagree.

A trial court may order a change of venue "* * * when it appears that a fair and impartial trial cannot be held in the jurisdiction in which the trial would otherwise be held * * *." R.C. 2901.12(J). See, also, Crim. R. 18(B).

Although a criminal defendant is entitled to "* * * a fair trial by a panel of impartial, 'indifferent' jurors," there is no requirement "* * * that the jurors be totally ignorant of the facts and issues involved." *Irvin* v. *Dowd* (1961), 366 U.S. 717, 722. Thus, the trial court must examine "* * * the totality of the surrounding facts * * *" and make its "* * * own estimate of local conditions * * *" when deciding whether a change of venue is warranted because of the pretrial publicity a case has received. *Id.* at 721.

In making this decision, the trial court should scrutinize closely the *voir dire* examination of prospective jurors. An important consideration in deciding whether pre-trial publicity has acted to prevent the defendant from having a fair trial is whether a "* * * juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court * * *." *Irvin, supra,* at 723.

Additionally, this court has held that "[t]he examination of jurors on their *voir dire* affords the best test as to whether prejudice exists in the community against the defendant, and where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion." *State* v. *Swiger* (1966), 5 Ohio St. 2d 151, 34 O.O. 2d 270, 214 N.E. 2d 417, paragraph one of the syllabus, certiorari denied (1966), 385 U.S. 874.

We are satisfied that the trial court herein did not abuse its discretion when it overruled appellant's motions for a change of venue. Extensive *voir dire* examinations were conducted prior to a jury being impanelled.[5] Fifty-two prospective jurors were questioned by the prosecutor, the defense counsel and the trial court concerning his or her opinion of appellant's guilt and whether he or she could set aside that opinion in order to render an impartial verdict based upon the evidence adduced during trial. In fact, appellant was so satisfied with the jury ultimately impanelled, that he elected not to use all his statutorily granted peremptory challenges.

Moreover, we find the pre-trial publicity herein was not such as to inflame the passions of the jury against appellant and deny him a fair trial. See *State* v. *Fairbanks* (1972), 32 Ohio St. 2d 34, 61 O.O. 2d 241, 289 N.E. 2d 352.

---

to the one now before us, the Supreme Court in *United States* v. *Hasting* (1983), 461 U.S. 499, 512, said that because of the overwhelming evidence of guilt, "* * * accepting the utterance of the prosecutor as improper, criticism of him could well be directed * * * at his competence and judg-

ment in jeopardizing an unanswered — and unanswerable — case."

[5] The *voir dire* examination, including challenges for cause and peremptory challenges by both parties, in the instant cause comprises fully 2,127 pages of the trial transcript totalling 3,340 pages.

The newspaper and broadcast accounts of the murder were neither so inflammatory nor so prejudicial as to warrant a change of venue.

In sum, there is no indication in the record that the trial court abused its discretion by denying appellant's motions for a change of venue. Appellant's second proposition of law is, therefore, without merit.

In appellant's third proposition of law, appellant contends that it was prejudicial error, under *Caldwell* v. *Mississippi* (1985), 472 U.S. 320, for the trial jury to be told that its determination regarding the death penalty is only a non-binding recommendation. We have previously considered and rejected this argument in *State* v. *Williams* (1986), 23 Ohio St. 3d 16, 21, 23 OBR 13, 18, 490 N.E. 2d 906, 912; *State* v. *Scott* (1986), 26 Ohio St. 3d 92, 104, 26 OBR 79, 89-90, 497 N.E. 2d 55, 65; *State* v. *Rogers* (1986), 28 Ohio St. 3d 427, 28 OBR 480, 504 N.E. 2d 52. Appellant has not persuaded us to alter our present position. Further, we find that the comments made by the trial court, the prosecutor and the defense counsel were not such as to diminish the jury's sense of responsibility for determining whether the sentence of death should be imposed.[6] Accordingly, we reject this proposition of law. But, see, our admonitions regarding the propriety of making such comments in *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 144, 22 OBR 203, 220, 489 N.E. 2d 795, 813.

In appellant's sixth proposition of law, he argues that a defendant in a capital case has the right to the assistance of a qualified psychologist to assist him in jury selection where there has been intense pretrial publicity. We disagree. In *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 194, 15 OBR 311, 336, 473 N.E. 2d 264, 292, this court previously upheld the denial of funding for a social scientist to assist in jury selection, when such expert acts only as a consultant to counsel as opposed to a source of evidence on relevant disputed factual issues. We find the *Jenkins* rationale equally applicable herein, because the psychologist would assist only in the selection of the jury and not testify on disputed factual issues. Accordingly, the trial court did not abuse its discretion in refusing to appoint a psychologist for appellant. Therefore, this proposition of law is overruled.

Appellant, in his seventh proposition of law, argues that he should have been permitted to act as co-counsel in his own behalf during the trial. Appellant argues that a hybrid representation of criminal defendant and defense counsel both preserves the reliability of the judicial process and protects his dignity. We do not agree. Neither the United States Constitution, the Ohio Constitution nor case law mandates such a hybrid representation. See *McKaskle* v. *Wiggins* (1984), 465 U.S. 168. Although appellant has the right either to appear

---

[6] Defense counsel's comments regarding the jury's "recommendation" of the death penalty in closing argument at the penalty phase are as follows:

"* * * When we say that to you, that you must consider these mitigating factors, and take them into account because they are extremely important, and even though your decision is a recommendation to the judge * * * don't think that just because it is only a recommendation of the death penalty that that relieves you of that responsibility. Don't go back there, one or more of you and say, well, all I am doing is recommending. * * * Each one of you are [*sic*] responsible for your own verdicts, and it is an extreme possibility that the sentence of death would occur once it has unanimously been recommended. * * *"

*pro se* or to have counsel, he has no corresponding right to act as co-counsel on his own behalf. Accordingly, appellant's seventh proposition of law is not well-taken.

Appellant, in his eighth proposition of law, urges that his arrest was unlawful and that all statements and evidence obtained as a result therefrom should have been suppressed at trial.

Appellant first argues that his arrest was illegal because it was effected without a warrant. We do not agree. The record indicates that the arrest was effected by appellant's parole officer, not a police officer. While police officers were present, they were there only to protect the parole officer and provide support, if needed, for the arrest.

In Ohio, a parole officer is not required to obtain a warrant prior to arresting a parolee for a parole violation. R.C. 2967.15 provides the procedure by which a parole officer may effect the arrest of a parolee. This section provides in part:

"* * * Whenever any parole officer has reasonable cause to believe that any parolee under the supervision of the [adult parole] authority has violated the terms and conditions of his pardon or parole, such parole officer may arrest such parolee, or may order any sheriff, deputy sheriff, constable, or police officer to make such arrest. * * *"

Thus, a parole officer may arrest a parolee if the parole officer has reasonable cause to believe that the parolee has violated the conditions of his parole. In this regard, R.C. 2967.15 is analogous to R.C. 2951.08, which authorizes the warrantless arrest of probationers for violating the terms and conditions of their probation.[7] This court has thus found, in the context of constitutional guarantees, no distinction between probationers and parolees. *State* v. *Roberts* (1987), 32 Ohio St. 3d 225, 513 N.E. 2d 720. Both probationers and parolees have been held to possess Fourth Amendment rights more limited than other people, because they are considered to be in the constructive, as opposed to actual or physical, custody of the state at all times during their probation or parole. *State* v. *Deener* (1980), 64 Ohio St. 2d 335, 18 O.O. 3d 499, 414 N.E. 2d 1055.

Appellant's parole was conditioned upon his obeying all municipal, state and federal laws. Since the arresting parole officer knew that appellant was the prime suspect in a murder investigation, that officer had reasonable cause to believe that appellant had violated his parole. Accordingly, the parole officer had the authority, pursuant to R.C. 2967.15, to make the warrantless arrest of appellant herein.

Appellant additionally argues that the warrantless entry into his brother's apartment to effectuate the arrest was illegal, and that the statements and evidence in question should therefore have been suppressed. We disagree. In *Payton* v. *New York* (1980), 445 U.S. 573, the Supreme Court held that police may not enter a suspect's home to arrest him without either a warrant or exigent circumstances. *Payton,* however, does not apply where the entry is made with the consent of the occupant. *Id.* at 583; *Steagald* v. *United States* (1981), 451 U.S. 204, 211-212. In the instant cause, the entry, if any, was consensual. Appellant answered the door and

---

[7] R.C. 2951.03 provides in part:

"During a period of probation, any field officer or probation officer may arrest the defendant without a warrant and bring him before the judge or magistrate before whom the cause was pending. * * *"

permitted the parole officer to place him under arrest. The record is unclear whether the parole officer actually entered the appellant's apartment; however, even if the entry therein had been forcible, it would have been legal because the parole officer herein needed no warrant to arrest appellant. Accordingly, suppression of the statement and evidence obtained at the time of appellant's arrest was not mandated by the warrantless entry, if any, of the parole officer into appellant's brother's apartment.

Appellant further complains that the manner of his arrest violated R.C. 2967.15. This section provides in part that a parolee arrested by a parole officer "* * * shall be confined in the jail or detention home *of the county in which he is arrested* until released on parole or removed to the proper institution. * * *" (Emphasis added.) We agree that the statutory procedure was not followed in this case. The arrest was effected in Franklin County, but appellant was transported to Licking County for incarceration. We do not, however, believe that such a technical violation of the statute is sufficient to justify an application of the exclusionary rule to either appellant's statements or the evidence obtained at the time of his arrest. This violation is simply not one of constitutional magnitude. See *State* v. *Unger* (1981), 67 Ohio St. 2d 65, 69-70, 21 O.O. 3d 41, 44, 423 N.E. 2d 1078, 1081.

Similarly, we reject appellant's argument that his right to counsel was infringed when he was not permitted to communicate with an attorney prior to being removed to Licking County.

In *State* v. *Unger, supra,* we held that a violation of R.C. 2935.14, upon which appellant relies, does not of itself require the application of the exclusionary rule. Furthermore, it is apparent from the record that appellant knew of his right to counsel, having been advised of his rights at the time of arrest and several times thereafter, but chose not to invoke such right with either an attorney or other person at the time. In view of this fact, we fail to see how the appellant was prejudiced.

Appellant, in his final challenge to the legality of his arrest, claims that pursuant to R.C. 2935.05, an affidavit describing the offense should have been issued immediately after his arrest, not five days later as was done herein. R.C. 2935.05 requires that a person arrested without a warrant must be taken before a court or magistrate "* * * without unnecessary delay, * * *" and that an affidavit describing the offense must be filed. Once this is done, a warrant is issued to the arresting officer or citizen pursuant to R.C. 2935.08. However, as stated *supra,* the parole officer herein was not required to obtain a warrant before arresting appellant. This fact is implicitly recognized by R.C. 2935.05 which states that it applies only to "* * * a person named in section 2935.03 of the Revised Code * * *." R.C. 2935.03 does not include a parole officer in its list of persons who must obtain warrants before performing arrests. Thus, the parole officer herein was not required to file an affidavit describing the offense in compliance with R.C. 2935.05.[8]

Although appellant was removed

---

[8] Appellant was originally arrested for a parole violation. However, while incarcerated, charges were filed against appellant for the rape and murder of the victim herein, at which time an affidavit was timely filed and a warrant for the arrest of appellant on those charges was issued.

Parole officers are ordinarily required

to Licking County instead of remaining in Franklin County, the arrest and incarceration of appellant were essentially valid. We have found that the errors herein do not reach constitutional proportion and thus they do not justify either application of the exclusionary rule or reversal of appellant's conviction. Accordingly, this proposition is not well-taken.

In proposition of law number nine, appellant asserts that, during the *guilt* phase, he was materially prejudiced by the projection and admission of gruesome photographic slides of the victim. We disagree.

Fourteen photographic slides were projected on a screen for the jury to see. Some slides were shown more than once, so that the jury observed a total of twenty-eight slides.

In *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768, this court stated in paragraph seven of the syllabus that "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." See, also, *State* v. *Morales* (1987), 32 Ohio St. 3d 252, 257-258, 513 N.E. 2d 267, 273-274. Thus, the test for admitting gruesome photographic evidence is twofold. Does the probative value of the photographs outweigh their prejudicial impact, and second, are the photographs repetitive or cumulative in number? Either a negative response to the first question, or a positive response to the second question will mean that the photographic evidence is inadmissible in a capital prosecution.

We have reviewed the slides in question and find that the trial court erred when it permitted certain of the slides to be shown at appellant's trial. Although the trial court viewed each of the slides *in camera* prior to trial, we find that the slides shown at appellant's trial were clearly repetitive and cumulative in number. The portrayal of the identical subject matter in two slides, one from a relative distance and the other from a close proximity to the subject matter, is clearly repetitive in nature. Accordingly, the trial court erred when it permitted the prosecution to project the repetitive slides for the jury.

Yet, notwithstanding the error in showing the repetitious slides, there is no doubt that the jury would have convicted appellant even if the slides had not been shown. Appellant's admissions and the other evidence produced clearly establish that appellant was the perpetrator of the crime herein. Thus, the showing of the slides, while error, did not work to the material prejudice of appellant in the *guilt* phase of this proceeding. Accordingly, the showing of the slides was harmless beyond a reasonable doubt and appellant's ninth proposition of law is overruled.

In his next proposition of law, number ten, appellant maintains that he was denied a fair trial when a witness was permitted to testify about appellant's apparent lack of remorse

---

to follow the procedures set forth in R.C. 2967.15 after the arrest of a parolee for a parole violation. The need to comply with those procedures here was obviated by the filing of charges against appellant and the issuance of a warrant for his arrest on those charges.

upon viewing photographs of the victim. As appellant failed to object to such testimony in the trial court, this proposition of law will be overruled absent a finding of plain error. We find that the trial court did not commit plain error by permitting the testimony. In *State* v. *Long* (1978), 53 Ohio St. 2d 91, 70 O.O. 3d 178, 372 N.E. 2d 804, we held in paragraph three of the syllabus that "notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." This standard has been met here. The testimony does not appear to have any particular relevance in this case and, further, in view of the overwhelming evidence of appellant's guilt, it is beyond doubt that the jury would have convicted appellant even if such testimony had not been given. Accordingly, the trial court did not commit plain error in permitting the witness to testify about appellant's apparent lack of remorse. This proposition of law is therefore overruled.

In proposition of law eleven, appellant contends that he was denied effective assistance of counsel. Essentially, appellant argues that his counsel failed to obtain the appointment of a forensic pathologist to assist him in presenting evidence and rebutting the state's witness on the issue of rape. Appellant also argues that his counsel should have sought to preserve certain potentially exculpatory physical evidence, namely the vaginal swabs that were taken of the victim. Again, we disagree.

In *Strickland* v. *Washington* (1984), 466 U.S. 668, 686, the United States Supreme Court stated that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." The court therein outlined a two-part test for evaluating whether assistance of counsel was so ineffective as to require reversal:

"First the defendant must show that counsel's performance was deficient. This requires showing the counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Additionally, "* * * a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (Citation omitted.) *Strickland, supra,* at 689. See, also, *State* v. *Clayton* (1980), 62 Ohio St. 2d 45, 16 O.O. 3d 35, 402 N.E. 2d 1189; *State* v. *Lytle* (1976), 48 Ohio St. 2d 391, 2 O.O. 3d 495, 358 N.E. 2d 623, vacated in part on other grounds (1978), 438 U.S. 910.

In the instant cause, appellant's counsel were not ineffective so as to have precluded a fair trial or to have created an unreliable result. Appellant was represented by two experienced trial attorneys who presumably were aware of the issues involving the evidence of rape. Appellant's counsel decided not to request the appointment

of a forensic pathologist, choosing instead to rely on their cross-examination of the state's expert in order to rebut the evidence of rape. In light of these circumstances, the errors alleged by appellant were neither so serious that his counsel were not functioning as the "counsel" guaranteed by the Sixth Amendment, nor so serious that the result of his trial was rendered unreliable.

Accordingly, we will not second-guess the judgment of appellant's counsel, and appellant's eleventh proposition of law is overruled.

Appellant also argues, in proposition of law thirteen, that the jury should have been instructed to make a specific finding as to whether appellant committed either vaginal rape, anal rape or both. Appellant argues that the omission of this instruction was error because some jurors may have found him guilty of one, but not the other, type of rape. Thus, appellant believes there might have been a non-unanimous finding of the type of rape. The answer to appellant's contention is again, no.

R.C. 2907.02(A)(2) is one part of Ohio's rape statute. This section provides:

"No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

"Sexual conduct" is defined by R.C. 2907.01(A) as "* * * vaginal intercourse * * *[,] anal intercourse, fellatio, and cunnilingus between persons * * *." Therefore, the jury had only to find that one of these forms of sexual conduct took place between the victim and appellant to find that a rape had been committed.[9] The statute simply does not require, as appellant asserts, that a specific finding be made as to the *type* of rape. Consequently, it was not error for the trial court to refuse to instruct the jury that it must make such a specific finding. The fact that some jurors might have found that appellant committed one, but not the other, type of rape in no way reduces the reliability of appellant's conviction, because a finding of either type of conduct is sufficient to establish the fact of rape in Ohio. Accordingly, appellant's thirteenth proposition of law is without merit.

In a related proposition of law, number fourteen, appellant maintains that the jury should have been instructed that felonious sexual penetration is a lesser included offense of rape. He contends that the instruction should have been given because the jury could have inferred from the evidence that an object other than a human penis caused the tear in the victim's anus.

As we recently held in *State v. Kidder* (1987), 32 Ohio St. 3d 279, 513 N.E.

---

[9] Although there is some question as to whether the state proved beyond a reasonable doubt that there had been an anal rape, there was conclusive evidence upon which the jury could decide that a vaginal rape had occurred. The autopsy revealed that there was seminal fluid in the victim's vagina that had been secreted by someone with type "B" blood. Neither the victim nor her husband has type "B" blood, whereas the appellant does. Furthermore, the victim was found in bed, naked, with her hands bound behind her back. Appellant admitted to having been there, to having grabbed her by the neck and to having later run downstairs from the bedroom before fleeing to Columbus. Thus, there was sufficient evidence for the jury to conclude that vaginal rape had taken place, and that the aggravating circumstance of rape was established.

2d 311, paragraph one of the syllabus, "[a]n offense may be a lesser included offense of another only if (i) the offense is a crime of *lesser* degree than the other * * *." (Emphasis added.) See, also, *State* v. *Rohdes* (1986), 23 Ohio St. 3d 225, 23 OBR 382, 492 N.E. 2d 430; *State* v. *Wilkins* (1980), 64 Ohio St. 2d 382, 18 O.O. 3d 528, 415 N.E. 2d 303. Because rape and felonious sexual penetration are both offenses of the *same* degree, felonious sexual penetration can never be a lesser included offense of rape. Accordingly, the trial court properly refused to give the requested instruction and appellant's proposition of law is overruled.[10]

In proposition of law fifteen, appellant argues that the jury should have been instructed that it could find him guilty of involuntary manslaughter, a lesser included offense of murder. We reject this argument for two reasons. First, the jury was not limited to finding the appellant guilty or innocent of a capital offense. The lesser included offense of murder, a non-capital crime, was an option available to the jury. *Beck* v. *Alabama* (1980), 447 U.S. 625. Second, "* * * due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." (Emphasis added.) *Hopper* v. *Evans* (1982), 456 U.S. 605, 611.

In the instant cause, the jury could not have reasonably found appellant guilty of involuntary manslaughter. All the evidence indicates that appellant purposefully murdered the victim. The cause of death was strangulation. Although appellant claims not to remember killing her, he remembers running downstairs from the room where the body was found. He also admits having cut the cord which was used to strangle her from a spool in his garage before going to the victim's home.

Taking the aforementioned evidence into consideration, a jury could not have reasonably found that appellant involuntarily murdered the victim. Thus, an instruction for involuntary manslaughter was not warranted. See, also, *State* v. *Wilkins, supra;* *State* v. *Nolton* (1969), 19 Ohio St. 2d 133, 48 O.O. 2d 119, 249 N.E. 2d 797. Accordingly, the trial court properly denied appellant's request for such an instruction. Therefore, appellant's fifteenth proposition of law is not well-taken.

Appellant, in proposition of law sixteen, challenges the propriety of certain jury instructions concerning the definitions of "purpose" and "causation." Specifically, appellant claims that these instructions might have misled the jury into believing that they could convict him even if he acted recklessly or negligently, as opposed to purposely. Appellant has, however, chosen to overlook an instruction which required the jury to find that appellant purposely intended to kill the victim.[11] As we stated in *State* v. *Price* (1979), 60 Ohio St. 2d 136, 14 O.O. 3d

---

[10] It should be noted that the trial court instructed the jury that it could find appellant guilty of the lesser included offense of murder. If the jury did not believe appellant had committed rape, then it had the option of convicting the appellant for murder rather than aggravated murder. Thus, there was no danger that the jury would convict appellant of aggravated murder, even if it believed no rape had occurred, in order to avoid acquitting him. The jury could have chosen to convict him of a lesser included, non-capital offense instead. See *Beck* v. *Alabama* (1980), 447 U.S. 625.

[11] The jury instructions concerning "purpose" and "causation" provided in pertinent part:

379, 398 N.E. 2d 772, paragraph four of the syllabus, a jury instruction "* * * must be viewed in the context of the overall charge, * * *" rather than in isolation.

When the jury charge here is considered in its entirety, it is certain that the jury could not have been misled as to the element of purpose. We therefore overrule appellant's sixteenth proposition of law.

As appellant's seventeenth proposition of law, he argues that the trial court committed plain error when it failed to orally instruct the jury that it was not required to find unanimously that appellant was innocent of aggravated murder before it considered the lesser offense of murder. We disagree.

We find that appellant failed to raise any objection pursuant to Crim. R. 30 and, in addition, that the alleged omission does not constitute plain error. Our review of the record reveals that the written charge to the jury was correct. Additionally, copies of the written charge were given to the jury. As noted above, notice of plain error is taken only under exceptional circumstances to avoid a manifest miscarriage of justice. *State* v. *Long, supra.* Accordingly, as the written charge to the jury was correct, appellant was not prejudiced by the omission of the trial court and his seventeenth proposition of law is overruled.

In his final contention concerning his conviction, proposition of law twenty-seven, appellant argues that his conviction is against the manifest weight of the evidence. We clearly do not agree.

We have thoroughly reviewed the record, particularly appellant's statements, the testimony of witnesses placing appellant at the victim's home at the time of the murder and the expert witness testimony concerning the pathology reports. On the basis of the aforementioned review, sufficient evidence exists in the record to convict

---

"Before you can find the defendant guilty of aggravated murder you must find beyond a reasonable doubt; * * * 2. That the killing was done purposefully. 3. That the defendant had the specific intent to cause the death of Elizabeth Hendren. * * *

"* * *

"Purpose. Purpose or intent is an essential element of the crime of aggravated murder. The law says a person acts purposefully when it is his specific intention to cause a certain result.

"It must be established in this case that at the time in queation [*sic*], or prior thereto, there was present in the mind of this defendant a specific intention to kill Elizabeth Hendren while the defendant was committing or attempting to commit the crime of rape.

"* * *

"The defendant may not be convicted of aggravated murder unless and until you find that the State of Ohio has proven beyond reasonable doubt that the defendant specifically intended to cause the death of Elizabeth Hendren. * * *

"Causation is also an essential element of aggravated murder. * * * Cause is an act which is a natural, logical and continuous sequence directly produces [*sic*] the death of a person and without which it would not have occurred. Cause occurs when the death is a natural and foreseeable result of the acts of the defendant.

"The test for foreseeability is not whether the defendant should have foreseen the death in its precise form. The test is whether in light of all circumstances, a reasonably prudent person would have anticipated the death was likely to result to anyone from the performance of the act or acts.

"A prudent man is the average or ordinary individual who exercises the same degree of care that all reasonable and diligent persons would exercise under the same or similar circumstances."

appellant of the rape and murder of Elizabeth Hendren. Accordingly, appellant's twenty-seventh proposition of law is not well-taken.

This concludes our review of appellant's challenges to the validity of his conviction for aggravated murder. Having found appellant's contentions devoid of merit, we hereby affirm his conviction.

## II

Appellant presents thirteen propositions of law, numbers 12, 22, 23, 24, 25, 28, 29, 34, 35, 36, 37, 38 and 39 which challenge the application and constitutionality of Ohio's death penalty statute. We have previously determined all these issues and have found the statute to be constitutional when measured against similar attacks. See, e.g., State v. Jenkins, supra; State v. Maurer, supra; and State v. Buell, supra. We therefore find these propositions of law to be not well-taken.

## III

We now turn our attention to a consideration of the validity of appellant's death sentence. Our review of the record reveals that the penalty phase of appellant's trial was severely flawed by the presence of prosecutorial misconduct. Add to this the previously discussed misconduct by the prosecutor, in the closing argument of the guilt phase, and one is led to the inevitable conclusion that appellant was materially prejudiced by the prosecutor's actions. Accordingly, we cannot, in good conscience, uphold appellant's sentence of death.

At issue are the comments made by the prosecutor during *both* closing arguments. The prosecutor's misconduct in closing argument in the guilt phase of this proceeding has been discussed *supra*. In question now are the prosecutor's comments made in the closing argument of the penalty phase. The prosecutor made the following remarks, concerning the gruesome photographic slides shown to the jury during the guilt phase of the trial, during the closing argument in the penalty phase:

"I know that Elizabeth Hendren is dead and I know that the defendant killed her. I know that the defendant raped her and I know that this is a horrible crime, and I know that in any criminal trial in the guilt or innocence trial or in the penalty phase trial, it means more than walking up and patting you on the head like a little dog and saying, hi folks, you did good, you were right, nice jury. That does not cut it. The State of Ohio gave you the evidence to work with. Don't pat it on the head and say, thank you, you did good. *You want aggravating circumstances, look at the slides. If you want the projector, we'll send it back with you.* Here's the rope that he killed her with, here's the blue box knife he had with him, there's the panty hose he used to tie her hands. You tell me when you put those on the scales and you consider what he did to Elizabeth Hendren that these [mitigating] factors he's talking about have to mean that those pieces of evidence prove less than proof beyond a reasonable doubt that those aggragating [*sic*] circumstances outweigh the mitigating factors." (Emphasis added.)

Generally, parties are granted a certain amount of latitude in closing argument. *State v. Maurer, supra* (15 Ohio St. 3d 239), at 269, 15 OBR at 404-405, 473 N.E. 2d at 794-795. However, there comes a time where prosecutorial misconduct during closing argument impairs a defendant's right to a fair trial. Such a point is reached where, as here, a prosecutor appeals to the passions of the jury in an attempt to obtain a favorable verdict.

The use of the gruesome slides earlier in the trial to illustrate expert

testimony was error, yet, harmless beyond a reasonable doubt because of the overwhelming evidence of appellant's guilt. The prosecutor's subsequent reference to those same slides at the penalty phase was impermissible. The question at the penalty phase is not guilt but what penalty is appropriate. Although the prosecutor did not actually show the slides again, his entreaty that the jury should remember the slides could have had no other effect than to cause the jurors to re-experience the horror and outrage they must have felt upon viewing the slides earlier in the trial. This later use of the slides to appeal to the jurors' emotions and to prejudice them against the appellant is grounds for reversal.

In our opinion, the combination of the prosecutor's prejudicial argument in the penalty phase aimed at inflaming the passions of the jury, and his resurrection of the gruesome photographic slides, created a climate in which the jury herein was unable to dispassionately weigh the aggravating circumstances against the mitigating factors. It is quite possible that the prosecutor's appeal to the jury, that it should remember the slides, induced the jury to give appellant a harsher sentence than it would have otherwise. As the Supreme Court of Tennessee has stated, it "[i]s precisely because of the danger that * * * [the jurors] will inflict excessive punishment that unnecessary inflammatory evidence is kept from them. * * * [Citations omitted.] The fact that death is now an available penalty for homicide poses, in view of the existing law on that thorny subject, a strong consideration in opposition to appealing to the emotions of jurors in assessment of punishment." *State* v. *Banks* (Tenn. 1978), 564 S.W. 2d 947, 952.

In addition, we are aware, of course, that the statutory scheme for the trial of aggravated capital cases is one of bifurcation. We would be naive not to recognize that those matters which occur in the guilt phase carry over and become part and parcel of the entire proceeding as the penalty phase is entered. The type and magnitude of any error then becomes the issue. In the case before us, the prosecutor's persistent references to the appellant's silence, continuing even after the trial court had sustained an objection to such comments, are errors so egregious that regardless of where they occurred in the overall trial, they cannot be ignored or overlooked. See, generally, *Wainwright* v. *Greenfield, supra.* When we add to this the prosecutor's improper conduct and remarks at the guilt phase, we are forced to conclude that the ultimate effect was such that the penalty phase of appellant's trial was fundamentally flawed and prejudicially unfair.

Therefore, regrettably, we are constrained to hold that any egregious error in the penalty phase of a death penalty proceeding, including prosecutorial misconduct, will be cause to vacate the sentence of death with a subsequent remand to the trial court for a new sentencing procedure pursuant to R.C. 2929.06. This action is mandated by the persistent efforts of the prosecutor which resulted in the appellant's not being given a fair trial in accordance with previous decisions of the United States Supreme Court and decisions of this court.

Accordingly, we hereby vacate appellant's death sentence and remand the cause for resentencing pursuant to R.C. 2929.06.[12]

*Judgment affirmed in part,*
*reversed in part and cause*
*remanded.*

---

[12] See *State* v. *Penix* (1987), 32 Ohio St. 3d 369, 513 N.E. 2d 744, syllabus.

MOYER, C.J., SWEENEY, DOUGLAS and H. BROWN, JJ., concur.

WRIGHT, J., concurs in the syllabus and judgment only.

LOCHER and HOLMES, JJ., dissent.

LOCHER, J., dissenting. I vigorously disagree with the outcome of this case. A careful review of the appellant's arguments and the record fails to reveal the presence of any error sufficiently prejudicial to warrant the reversal of the appellant's death sentence.

I

Initially, it was not error for the trial court to admit into evidence some of the photographic slides taken of the victim's body. The standard to be applied by trial courts in the admission of gruesome photographs was enunciated by this court in State v. Maurer (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768, at paragraph seven of the syllabus:

"Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number."

Generally, "the admission of photographs is left to the sound discretion of the trial court." Maurer, supra, at 264, 15 OBR at 401, 473 N.E. 2d at 791; see, also, Evid. R. 403 and 611(A). In State v. Hymore (1967), 9 Ohio St. 2d 122, 128, 38 O.O. 2d 298, 302, 224 N.E. 2d 126, 130, we stated that a "trial court has broad discretion in the admission * * * of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere." An abuse of discretion by a trial court connotes " 'not merely error of judgment, but perversity of will, passion, prejudice, partiality or moral delinquency.' " State, ex rel. Shafer, v. Ohio Turnpike Comm. (1953), 159 Ohio St. 581, 590-591, 50 O.O. 465, 469, 113 N.E. 2d 14, 19.

It simply cannot be said that the trial court in the case sub judice abused its discretion by admitting the photographic slides in question. After viewing each of the slides in camera prior to trial, the court applied the Maurer standard and ruled that certain of the slides offered by the prosecutor could be admitted as having probative value in excess of the danger of material prejudice to the appellant, while the others had to be rejected as being either repetitive, cumulative, or of insufficient probative value. Also, the error cited by the majority, namely, the "portrayal of the identical subject matter in two slides, one from a relative distance and the other from close proximity of the subject matter," does not amount to a clear abuse of discretion by the trial court.

Additionally, to say that the admission of two repetitive photographs is error is absurd in the light of our decision in State v. Morales (1987), 32 Ohio St. 3d 252, 513 N.E. 2d 267. In Morales, this court upheld the admission of no fewer than thirty-one photographs of the victim's bloody, bruised and broken body, all of which were unquestionably more gruesome than those of the victim herein. It is difficult to reconcile the fact that the court today finds the admission of two similar photographs to be repetitive and cumulative with the fact that the court did not find such error in the admission of so many photographs of the same subject in Morales.

## II

The majority's assertion that the prosecutor committed an egregious error during closing argument in the mitigation phase of the trial is likewise without foundation. The prosecutor made the following statements to the jury:

"The State of Ohio gave you the evidence to work with. * * * You want aggravating circumstances, look at the slides. If you want the projector, we'll send it back with you. Here's the rope that he killed her with, here's the blue box knife he had with him, there's the panty hose he used to tie her hands. You tell me when you put those on the scales and you consider what he did to Elizabeth Hendren that these [mitigating] factors he's talking about have to mean that those pieces of evidence prove less than proof beyond a reasonable doubt that those aggragating [*sic*] circumstances outweigh the mitigating factors."

In general, prosecutors are allowed a certain amount of latitude in closing argument. See, *e.g., State* v. *Byrd* (1987), 32 Ohio St. 3d 79, 82, 512 N.E. 2d 611, 616; *State* v. *Maurer, supra,* at 269, 15 OBR at 404-405, 473 N.E. 2d at 794-795; *State* v. *Woodards* (1966), 6 Ohio St. 2d 14, 26, 35 O.O. 2d 8, 14, 215 N.E. 2d 568, 578. This is because prosecutors have a duty to represent the state as zealously and aggressively as they can, just as defense counsel are expected to defend their clients to the utmost.

With this in mind, it is difficult to see why the prosecutor's comments in this case constitute prosecutorial misconduct. There was nothing *per se* erroneous about what he said, since his comments were both within the record and substantiated by the evidence. The comments were not, as the majority maintains, intended to prejudice the jury against the appellant. Instead, the comments were clearly directed at reminding the jury of the evidence proving the existence of the aggravating circumstance. R.C. 2929.03 (D)(1) provides in part that:

"The court, and *the trial jury* if the offender was tried by jury, *shall consider * * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing* or to any factors in mitigation of the imposition of the sentence of death, * * * and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender." (Emphasis added.)

The prosecutor's references to the slides, the rope, the knife and the panty hose were merely a review of the evidence against the appellant which supported his conviction for aggravated murder. The statute obligated the jury to consider this evidence. To say that a prosecutor cannot remind the jury of the existence of such evidence is to render the prosecutor unable to rebut the defendant's evidence of mitigating factors and to render the jury incapable of intelligently weighing the aggravating circumstances against the mitigating factors. Thus, it can only be said that the prosecutor was doing his job when he made the statements in question.

The majority contends that the prosecutor's comments prejudiced the jury against the appellant because they reminded the jury of the gruesome slides of the victim shown earlier in the trial. However, it was not error for the prosecutor to mention the slides because they were evidence supporting the existence of the aggravating circumstance of rape. The slides were properly admitted by the trial court because their probative value outweighed the danger of prejudice to the appellant. Their evidentiary value re-

mained undiminished at the time the references to them were made, because they were still relevant to the issue of whether the aggravating circumstance of rape outweighed the mitigating factors beyond a reasonable doubt. Therefore, the prosecutor did not commit an egregious error when he referred to the slides during closing argument.

## III

Even if it is assumed that the prosecutor's reference to the slides was error, such error was not materially prejudicial to the appellant. The comments in question were limited to a single instance, and were so innocuous that they were not objected to by the appellant's counsel. Furthermore, the trial court specifically instructed the jury afterwards that the arguments of counsel were not to be considered as evidence.

Under these circumstances, it is very unlikely that the prosecutor's comments induced the jury to give the appellant a harsher sentence than it would have given otherwise. The heinous nature of the appellant's crime and the overwhelming evidence of his guilt more than justified the jury's recommendation that the appellant be sentenced to death. As the appellant said in his unsworn statement during the penalty phase, he felt that the jury's verdict was "fair and honest," that "what I have done was a senseless act," and that "I would have come to the same conclusion if I were sitting on the jury."

Taking all of the facts and circumstances of this case into account, it is clear that the appellant was not deprived of his constitutional rights or of a fundamentally fair trial.

## IV

Finally, the majority applies what amounts to a cumulative-error test in reversing the appellant's sentence. In essence, the majority holds that a death sentence may now be vacated when the cumulative effect of errors in both the guilt and mitigation phases of a capital prosecution deprives the defendant of a fair trial.

This court has recently held that a conviction must be reversed when cumulative errors in the admission of evidence materially prejudice the defendant. *State* v. *DeMarco*. (1987), 31 Ohio St. 3d 191, 31 OBR 390, 509 N.E. 2d 1256. However, a capital prosecution is significantly different from an ordinary criminal proceeding. As recommended by the United States Supreme Court in *Gregg* v. *Georgia* (1976), 428 U.S. 153, Ohio's statutory scheme provides for bifurcated trials in capital cases. See R.C. 2929.03. Today's decision erodes the bifurcation intended by the General Assembly by stating that "matters which occur in the guilt phase carry over and become part and parcel of the entire proceeding." The majority thus creates a precedent that will open a new avenue of appeal for many defendants, and that will encourage defendants to argue that their death sentences should be vacated because of the cumulative effect of the trivial mistakes that inevitably occur over the length of a capital prosecution.

## V

For all the above reasons, I would affirm the appellant's sentence. There is simply nothing in the record which convinces me that the prosecutor committed reversible error in either stage of the trial, and it seems to me that the majority exaggerates the prejudicial effect, if any, of his conduct. Also, it occurs to me that many of our decisions in criminal cases, including this one, express a lack of concern for the victims of the crimes involved. Even in the face of overwhelming evidence of

the defendant's guilt, we often appear to be more concerned with procedural niceties and protecting the rights of the criminals than with protecting society from the criminals. What is needed is a more equitable approach that balances the rights of criminals to a fair trial against the rights of our citizens to be safe from crime. In the instant case, the appellant received a fair trial. In view of his overwhelming guilt, the reversal of his death sentence will only cause a further loss of faith in our criminal justice system, particularly among the families of the victims of similar crimes.

Accordingly, I dissent.

HOLMES, J., concurs in the foregoing dissenting opinion.