DECISION.
Appellant Daniel Aria was convicted of one count of aggravated burglary with two firearm specifications, four counts of abduction, each with two accompanying firearm specifications, and two counts of felonious assault, with each count accompanied by two firearm specifications. The trial court ordered that the sentences for the firearm specifications run concurrently for a term of three years' incarceration. It merged the two felonious-assault counts into one for purposes of sentencing, imposing an eight-year sentence; and it then imposed a ten-year sentence for the aggravated burglary and a five-year sentence for each of the abduction counts. The trial court ordered those sentences to run consecutively. Thus, Aria was sentenced to a forty-one-year prison term.
Aria appeals his convictions, raising six assignments of error. In his first assignment, Aria contends that the trial court erred when it refused to instruct the jury on negligent assault. In his second, third, fourth, and fifth assignments, Aria asserts that he was denied effective assistance of counsel because of various omissions by his trial counsel. In his last assignment, Aria challenges both the weight and the sufficiency of the evidence supporting his convictions.
Aria, Lori Mills, and the victim, Jerry Fair, were at the Downtown Athletic Club, a bar located in Arlington Heights. Fair resided in an apartment above the bar, along with Tom Harbers and Pete Tietjen. During the evening, Aria had been buying drinks for Mills and others. At one point, when he opened his wallet, his money fell out, and Mills warned him that he should not have all his money with him. In the early morning hours, Aria and Mills began arguing outside the bar, and Fair intervened. There was evidence that Aria was romantically interested in Mills, who had accompanied Fair on a few casual dates. Fair denied that he had a romantic relationship with Mills. During the argument, Aria threatened to get a gun and kill everyone. Eventually, Fair had a friend, Dave Manwell, drive Mills home, Aria left, and Fair went to his own apartment.
Manwell returned to the apartment after transporting Mills to her house. Soon afterwards, while Fair, Harbers, Tietjen, and Manwell were sitting in the apartment, Aria entered through the apartment door, swinging a dark-colored handgun. When Manwell tried to calm Aria, he placed the gun to Manwell's head. He accused the men of taking his wallet and demanded that they throw their money on the floor. When Harbers did not comply, Aria held the gun to his head. Aria then kicked the money, saying that it was not about the money, but that one of the men was going to "get messed up." At that point, Fair tackled Aria, and they wrestled, ending up in the bathroom. Aria had Fair in a headlock when the gun fired. The bullet entered the back of Fair's head in his neck area. None of the men felt free to leave, none of the witnesses saw Fair have control of the gun, and none of the witnesses believed that the firing of the gun was accidental. After firing the shot, Aria told the men that Fair had betrayed him and asked who wanted to be next.
Fair's head was bleeding profusely, and he slumped against the bathroom wall. The men started pleading with Aria to call 911 because they feared for Fair's life. Aria allowed Tietjen to place a towel on Fair's head to stop the bleeding, but he would not call for help. Fair fell to his stomach and pulled himself across the room. He reached up to Aria, and Aria kicked his arm, saying that he was going to die anyway. Twenty minutes after Aria shot Fair, he attempted to fire another shot, but the gun misfired.
Tietjen was able to run outside, where he broke into another building and made a 911 call. Aria kept repeating that the men were going to die and stuck the gun against Harbers's head. The men finally convinced Aria to call 911. While he was on the telephone, police arrived and demanded that everyone get on the floor and that Aria put down the gun. Aria did not comply initially, but he was eventually handcuffed and taken into custody. The entire incident in the apartment lasted approximately forty-five minutes.
Fair testified that he was eighty-percent blind and that he had paralysis on his left side. He stated that his disabilities were lifelong.
Aria's common-law wife, Deborah Ballou, testified that Aria was upset because he believed that Mills had taken his wallet. According to her, Aria was very intoxicated when he went to Fair's apartment to get his money. Ballou stated that Aria's wallet was found at the bar and was returned. She also testified that Aria did not have a gun, but that she had found one in a briefcase left at an apartment house and had given it to Aria to sell. He returned with cocaine. He told her that he had obtained the cocaine from Fair.
Aria testified that Fair had an expensive cocaine habit. On the evening of the incident, he had accompanied Harbers, Fair and Tietjen to the apartment, where they all used cocaine. Fair then invited Aria to a "get-together" after the bar closed. After the bar closed, Aria explained to Fair that he did not have a sexual relationship with Mills, and that Mills had been calling him. In fact, he testified, he had Mills's number on his caller ID. Mills would not admit that she had been flirting with and calling Aria. Aria left and discovered that his wallet was missing. He believed that Mills had taken it and returned to the apartment.
He knocked on the door, yelled, and asked if he could enter. Either Harbers or Fair invited him in. He looked to see if Mills was there. He then told the men that he wanted to call Mills about his wallet, but they refused to give him Mills's telephone number. Aria then threatened to call the police about Harbers's cocaine. The men gave him their wallets, asking him not to call the police.
Fearing that Aria would go to the police, Fair tackled him, and, at that point, Aria saw that Fair had the gun he had previously sold him. He tried to get the gun, but, during the struggle with Fair, Fair pulled the trigger, shooting Aria in the hand. According to Aria, the bullet not only entered his hand, but also entered the back of Fair's head. Aria kept the gun in his hand. Discovering it was jammed, he attempted to make it operable. He held his injured hand behind his back and kept the gun because he did not want the men to know that he was injured and unarmed. According to Aria, he told Harbers to call 911, and Harbers refused to do so. Tientjes asked to help Fair, and Aria stated that he was not holding the men hostage, but that he feared that they would rush him. Sometime after tending to Fair, Tientjes grabbed a bag of cocaine from the table and ran out.
Aria eventually made the call to 911. According to him, when the police arrived, he did not put the gun down immediately because he feared for his safety. He testified that one of the officers punched him. According to Aria, the police in that area did not like him, and he feared for his life.
Fair argues in his first assignment that the trial court erred by refusing to give a negligent-assault instruction. Negligent assault is a lesser-included offense of felonious assault, with the difference between the two being the mens rea necessary for conviction.[1] Felonious assault under R.C. 2903.11(A)(2) requires that the offender knowingly cause serious physical harm to another by means of a deadly weapon or ordnance, while negligent assault under R.C. 2903.14 requires that the offender negligently cause physical harm to another by use of a deadly weapon or dangerous ordnance.
R.C. 2901.22(B) provides the following:
 A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.
The legislature has, in turn, defined "negligently" in R.C. 2901.22(D), as follows:
 A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse of due care, he fails to perceive or avoid a risk that such circumstances may exist.
When an instruction on a lesser-included offense is requested, the instruction "is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."[2] In this case, we conclude that there was sufficient evidence from which the jury could have found Aria guilty of knowingly causing serious physical harm to Fair. The state's evidence demonstrated that Aria pointed a gun at Fair's head while he held him in a headlock and that he made threats to shoot Fair. But a reasonable jury could not have found Aria guilty of negligent assault from the evidence presented at trial. While Aria testified that the gun went off during a struggle, he denied that he fired the gun. He testified instead that it was Fair who had pulled the trigger, shooting a bullet through Aria's hand and Fair's own head. If the jury believed that evidence, then Aria lacked the criminal culpability required for negligent assault and was innocent of any crime. Moreover, Aria's statement to the 911 operator contradicted his trial testimony. On the tape, he told the operator that he had shot Fair. Thus, the instruction on the lesser-included offense would have been improper. We overrule Aria's first assignment.
In his second, third, fourth, and fifth assignments, Aria claims that his trial counsel was ineffective for failing to do the following: (1) request an instruction on self-defense; (2) bring Aria's statement into evidence; (3) present evidence in mitigation; and (4) object to Fair's testimony. To prevail on his claim of ineffective assistance of counsel, Aria has the burden to demonstrate that counsel's performance was so deficient that it fell below an objective standard of reasonable representation, and that counsel's errors were so prejudicial that they undermined the outcome of the trial.[3] A strong presumption exists in Ohio that a licensed attorney is competent, and that a challenged activity reflects a sound trial strategy under the circumstances.[4]
Whether to seek an instruction on self-defense is usually a tactical decision.[5] Under the facts of this case, Aria's counsel could have concluded that a self-defense instruction was inconsistent with Aria's defense that he did not pull the trigger. Further, such a defense would not have been persuasive, as the evidence demonstrated that Aria was at fault in creating the situation giving rise to the affray by entering Fair's apartment with a gun and making threats. We cannot conclude that the failure to request the instruction constituted ineffective assistance of counsel under the circumstances in this case. We overrule Aria's second assignment.
Aria also claims that he was denied effective assistance of counsel because his trial counsel failed to enter into evidence the entire statement that Aria had given to the police. Our review of this assignment is complicated by the state of the record. The state apparently used a transcript of Aria's taped statement in its cross-examination. Defense counsel objected to the use of the transcript for impeachment, stating that the transcript represented "somebody else's statements." The state had all or part of the actual audiotape of Aria's statement played to the jury. But the contents of the audiotape were not transcribed for the record.
At the end of Aria's testimony and out of the hearing of the jury, the state mentioned that it would not have the audiotape transcribed because it had only been used to refresh Aria's memory, and because the state did not intend to introduce it as an exhibit. The trial court pointed out that the court reporter had not transcribed the tape, and, thus, that it was not a part of the record. Defense counsel explicitly waived making the contents of the audiotape a part of the record, because "for the most part, what we heard is what happened to him anyway."
Without having before us what was recorded on the audiotape, we cannot determine whether the alleged failure to introduce Aria's entire statement to the jury constituted ineffective assistance of counsel. Therefore, we conclude that Aria has failed to demonstrate that the alleged deficient performance of his trial counsel prejudiced him. We overrule Aria's third assignment.
In his fourth assignment, Aria claims that counsel was ineffective for not presenting evidence in mitigation. Specifically, he argues that counsel should have submitted a psychological report. The record demonstrates that, at sentencing, counsel did inform the court that Aria had been institutionalized at a young age, that he had a mental-health caseworker, that he was under supervision, that he had a number of emotional problems, and that he responded well to medication. There is nothing in the record to demonstrate that the trial court did not consider any of this mitigating evidence. We conclude that Aria has failed to demonstrate that his trial counsel was ineffective in this respect and overrule his fourth assignment.
In his last ineffective-assistance claim, Aria argues that trial counsel was ineffective for failing to object to Fair's description that he was eighty-percent blind and crippled, and that the bullet Aria fired was lodged in his head. While we agree that Fair was not qualified to testify about specific medical details, we do believe that he was competent to testify from his personal knowledge that the bullet was in his head (a fact that was not disputed), that his vision had been impaired, and that his left hand and leg were paralyzed. Counsel's failure to object did not constitute ineffective assistance. We overrule Aria's fifth assignment.
In his sixth assignment, Aria challenges the weight and the sufficiency of the evidence, asserting that Fair's tackling of Aria was an intervening act that precipitated the firing of the gun. The sufficiency-of-the-evidence challenge in this case requires us to examine the evidence at trial and determine whether that evidence, viewed in a light most favorable to the state, could have convinced any rational trier of fact beyond a reasonable doubt that Aria was guilty of the crimes for which he was convicted.[6] To reverse on the manifest-weight-of-the-evidence claim, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine that the factfinder "lost its way."[7] We have reviewed the evidence under the applicable standards and conclude that Aria's convictions were neither against the manifest weight of the evidence nor unsupported by sufficient evidence. We overrule his sixth assignment.
Accordingly, the trial court's judgment is affirmed.
 ____________________ Painter, Judge.
 Gorman, P.J., and Sundermann, J., concur.
[1] See State v. LeFevre (May 4, 1995), Franklin App. No. 94APA09-1376, unreported.
[2] See State v. Thomas (1988), 40 Ohio St.3d 213, 533 N.E.2d 286,287, paragraph two of the syllabus.
[3] See Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 2064.
[4] See State v. Thompson (1987), 33 Ohio St.3d 1, 10, 514 N.E.2d 407,417.
[5] See State v. Burns (Aug. 3, 2000), Cuyahoga App. No. 69676, unreported.
[6] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[7] State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717,720-721.