OPINION
The cornerstone of our judicial system is the premise that no person shall be convicted of a crime until he or she has been afforded the opportunity to have a fair trial. For the reasons that follow, we find that Brian M. Brant was not afforded a fair trial. We express no opinion as to whether Brant is innocent or guilty.
Rape is a crime of violence which ultimately devastates the lives of at least two people. It is beyond question that emotional damage is suffered by the victim. The perpetrator, on the other hand, is labeled for life as a rapist and left to lead a life of rejection and scorn by society as a whole. It is a crime which generates strong passions in the minds of all who come in contact with the event. For these reasons, it is the duty of all courts to insure that justice is served for both parties.
Appellant, Brian M. Brant ("Brant"), appeals from the April 6, 1999 judgment of the Portage County Court of Common Pleas denying his motion for postconviction relief. On April 29, 1994, Brant was indicted on three counts of rape and one count of kidnapping, all counts being felonies of the first degree. The underlying incident occurred on April 1, 1994. After a jury trial, on October 7, 1994, Brant was convicted of all four offenses and sentenced to serve ten to twenty-five years on each of the rape charges, to run concurrently, and five to twenty-five years on the kidnapping charge, to be served consecutively. Brant's cumulative sentence is for fifteen to fifty years. He has been in prison since October 12, 1994. He was twenty-seven years old at the time of the alleged rape.
This is a case of what is commonly referred to as "date rape." The only witnesses to the alleged crime were Brant and the victim, Danielle Ondayko ("Ondayko"). On April 1, 1994, Ms. Ondayko was an eighteen-year-old freshman at the University of Akron. The incident occurred on a Thursday night. Ondayko had been studying in her dorm until after 11:30 p.m., when she left to meet some friends at a bar called Brewsky's at midnight. She drove to the bar and parked about one block away. Once in the bar, Ondayko could not find her friends, as they had left before she arrived.
Brant, whose first name is Brian, introduced himself to her as "Tim." Brant offered to buy her a drink. Brant testified she was drinking. She testified she was not, and that she drank water all night long. In fact, the nurse who observed her the following morning noted an odor of alcohol on her breath, and the blood sample taken at 9:00 a.m. indicated alcohol in her bloodstream. According to Brant, upon meeting, they talked for thirty to forty-five minutes.
Ondayko testified that at 2:15 a.m. she asked a bouncer if he could walk her to her car, and the bouncer said he could not. She said Brant then offered to escort her to her car and she accepted. But rather than walking to her car one block away, they got into his vehicle, which was parked next to the bar. According to Ondayko, once in the car, Brant asked her if she would like to go to a sorority party, and she accepted the offer. According to Brant, before they left the bar, she had been asking if there were any after-hours parties they could go to after they left the bar, and that he had indicated there may be a party on a golf course near Kent, Ohio. They left for a party.
Brant drove to a golf course in Brimfield Township and pulled into a small gravel parking area. There were no other cars. The temperature was approximately 40 degrees. Ondayko had not worn a jacket because she did not want to have to carry it around the bar, where it was hot. She was wearing blue jeans and a white "body suit," which was a thin, long sleeved, tight fitting garment. There was no party in sight. Ondayko testified Brant told her the party was back on the golf course, and they had to walk to it. Brant testified she was anxious to go to a party and wanted to go looking for it. Brant took a blanket out of his car, and they walked onto the course. After walking on the course for a while and not seeing a party anywhere, either Brant or the both of them spread the blanket out to sit down. Ondayko testified that Brant insisted that they sit down for a while, whereas she did not want to sit. Once sitting, Brant began kissing her against her wishes. She asked him to stop, but he continued. She told him she wanted to go find the party, and "he looked at me and laughed, like scenically (sic) and he said, `there is no party.'" Ondayko testified that was when she realized she was in trouble. She asked to be taken home, and he told her "in a little bit." Ondayko then testified as follows:
 A: "He started unbuckling my belt at this time, and, you know, I asked him what he was doing, and he said that he just wanted to make me feel good and he said that he loved me so much and he said that the first time he saw me he loved me.
 "And I said, `that's crazy, you don't even know me,' and he said, `I just want to make you feel good,' and I said, `I don't want to feel good if that's what it was,' and he unzipped my pants, and unbuttoned my bodysuit. I was pinned down and he took my underwear down.
"* * *
"He started — he performed oral sex on me."
 Ondayko testified that afterwards, Brant demanded she perform oral sex on him. When she began getting up to run, Brant "slammed" her back to the ground and told her if she wanted to get rough about it, he could get rough. She testified that she was shocked and scared for her life after she hit the ground. He then forced her to perform oral sex on him. After that, he then got on top of her and either attempted or simulated sexual intercourse. Ondayko testified that he told her it was not sexual intercourse. She testified she did not know, only that it was hurting very bad. At this point, Brant was apparently unable to maintain an erection. Ondayko testified she was crying through the entire process and continually saying "no." She testified his threats consisted of telling her she would not be going home until she did these things, and when he slammed her to the ground, she knew he was serious, and "wouldn't let up for nothing."
Afterwards, they got dressed and walked back to his vehicle. Ondayko testified she had to go with him because she had no idea where they were. Brant either asked Ondayko or forced her to drive the vehicle home. They drove back to her car. Ondayko testified that during the drive back to her car, he acted like he wanted to go out with her again, apologized, and asked her for her phone number. She gave him her phone number, and she asked him for his, hoping to get it to give to the police. He did not give her his phone number. Brant testified that after he got her number, she asked when he was going to call, and he told her he had a girlfriend. She became very upset, saying she had never done anything like this before and he had taken advantage of her. When they got to her car, Ondayko testified Brant acted as if nothing (bad) had happened, he opened her car door for her, and he kissed her goodnight. Brant testified he did not give her his number or correct name because on a previous occasion he had cheated on his girlfriend and the person had told his girlfriend about it. He testified that the sexual activity was consensual and that she had even initiated some of the contact. Brant was ultimately identified because a police cruiser had driven by the golf course and the officer wrote down the license plate number of his car.
Ondayko got back to her dorm room at about 5:00 a.m. She woke up her roommate and told her she thought she had been raped. She called the rape crisis hotline and was directed to go immediately to the hospital, which she did. At the hospital, Ondayko was examined by Pediatric Nurse Practitioner, Donna Abbott ("Nurse Abbott"), who testified as the state's expert at trial. Nurse Abbott has training and experience in the area of sexual abuse and assault. Nurse Abbott took a specimen from the vagina. The specimen was DNA tested and matched Brant. One in ten thousand people would match the specimen. Nurse Abbott testified that the victim's labia, which covers the vagina, was discolored on one side, very red, and swollen. Inside, right beneath her vagina on the posterior fourchette, there was a "very minute tear." The tear was two to three millimeters long, one millimeter being approximately the size of a pinhead, or .04 inches.
At trial, on direct examination, Nurse Abbott testified these symptoms were consistent with force. On redirect examination she testified that in her opinion there was forced sexual intercourse. Nurse Abbott testified that normally an examiner cannot tell if a person has recently had sex, but that when it is forced there will be some tears visible, as she saw on Ms. Ondayko. Nurse Abbott also testified that Ondayko's hymen, which is the entrance to the vagina, was intact and had no tears. The medical report which was prepared stated the "vulva and labia had moderate erythema and edema, labia, i.e., vulvitis." Erythema means redness, edema means swelling, and vulvitis is general inflammation. Ms. Ondayko did not have any other bruises or markings on any other part of her body.
At trial, the state presented testimony from Ondayko; Nurse Abbott; Casey Rogers, who was an acquaintance of Brant's and danced with him at Brewsky's that evening; Linda Luke, who did the DNA testing; Ondayko's roommate; and two police officers.
The only person to testify for the defense was Brant himself. Brant denied he forced her to do anything, stated all the conduct was consensual, and that she had initiated some of the activity. Brant was convicted of all three counts of rape, one for cunnilingus, one for fellatio, and one for vaginal intercourse. He was also convicted of kidnapping.
Brant filed his notice of appeal on October 28, 1994. In State v. Brant (Sept. 22, 1995), Portage App. No. 94-P-0117, unreported, this court affirmed the judgment of the trial court. However, this court's analysis of Brant's third and fourth assignments of error concluded that errors had occurred, but, due to defense counsel's failure to object, review of these errors was limited to plain error analysis. Under that standard of review, it was not apparent that, but for these errors, the outcome of the trial would clearly have been different.
Specifically, the third assignment of error related to the testimony of Casey Rogers. Ms. Rogers testified that she spoke with Brant on the phone the day the incident occurred. Brant met her at Brewsky's that night. Ms. Rogers testified that she danced with Brant, and that Brant repeatedly asked her to leave the bar with her, presumably to engage in sexual activity. She testified that upon a final refusal to leave the bar with him, Brant became upset, grabbed her shirt and shoved her. This was inadmissible and improper character evidence. The testimony was not relevant to prove whether Brant intended to rape Ondayko. Nor was it relevant to prove plan or scheme, and thus was inadmissible "other acts" testimony, which, nevertheless, was heard by the jury without objection.
The fourth assignment of error related to the prosecution's closing argument. The prosecutor argued that had Ms. Rogers left the bar with Brant, she would have been the victim, or, in other words, argued that Rogers' testimony showed that Brant intended to rape someone
that night. The prosecution also argued he was targeting "blondes." As the underlying testimony was inadmissible, the argument was improper. However, since defense counsel failed to object to either the testimony or the argument, the error was subject only to plain error analysis. In light of the other evidence presented at trial, it was not apparent that, but for the prosecutor's improper argument, the jury would have reached a different conclusion.
In Brant's fifth assignment of error on direct appeal, he argued he was denied effective assistance of counsel. The basis for this argument was counsel's failure to make objections and arguments in relation to his first four assignments of error. We agreed that counsel's performance was deficient with respect to his failure to object to the testimony of Ms. Rogers, and the subsequent argument. We concluded this fell below the objective standard of reasonable performance. However, it was not evident that had counsel appropriately objected, there was a reasonable probability the result of the trial would have been different. Therefore, a reversal on the grounds of ineffective assistance of counsel was not warranted. The judgment of the trial court was affirmed. The Supreme Court of Ohio denied further review. Statev. Brant (1995), 74 Ohio St.3d 1453, and State v. Brant (1996),75 Ohio St.3d 1404.
On September 17, 1996, Brant filed a petition for postconviction relief, asserting he was denied effective assistance of trial counsel and arguing grounds other than those asserted in the direct appeal. A prior claim of ineffective assistance of counsel does not bar a subsequent claim regarding some other aspect of counsel's performance. State v. Belden (Mar. 1, 1991), Trumbull App. No. 90-T-4431, unreported, at 5-6. Also, the grounds raised in the petition existed dehors the original trial record. As such, they could not have been raised in the direct appeal and were properly before the court in postconviction relief proceedings. State v. Hester (1976), 45 Ohio St.2d 71. One of the issues raised in the petition was defense counsel's failure to call an expert witness to rebut the testimony of Nurse Abbott that her examination revealed Ondayko was the victim of forced sexual penetration.
With his petition, Brant submitted an affidavit of Dr. Gayleen P. Kolaczewski. Dr. Kolaczewski stated that Brant contacted her prior to the trial and provided her with the victim's emergency room and sexual abuse records. After reviewing the records, the doctor was prepared to testify that the ambiguous signs of trauma to the victim's genitalia, combined with other observations noted in the reports, led her to the conclusion that the victim was not subjected to forced vaginal penetration. Dr. Kolaczewski stated that the redness and swelling around the outer portion of the victim's vagina could be the result of a number of innocuous causes, including simply wearing clothing that was too tight. Dr. Kolaczewski was informed by Brant of the dates she would be needed to testify. She cleared her schedule of appointments for those two days, but defense counsel, who was aware of her availability, never contacted her or called her to testify.
On February 7, 1997, the trial court dismissed the petition without conducting an evidentiary hearing. Citing Statev. Bradley (1989), 42 Ohio St.3d 136, the judgment entry stated "[t]rial counsel's failure to conduct pre-trial investigation did not give rise to a presumption of prejudice and ineffective assistance of counsel because Defendant's attorney * * * did not completely fail to undertake a pre-trial investigation and did present a reasonable defense strategy."
In State v. Brant (Apr. 17, 1998), Portage App. No. 97-P-0019, unreported, this court reversed the trial court's judgment, stating:
 "Since the postconviction relief petition must clearly allege a factual situation that, if proved at a hearing, would entitle the petitioner to relief, a petition asserting trial counsel's failure to call a witness must demonstrate how the uncalled witness' testimony would have benefited the defense. A marginal benefit is not sufficient because, under Strickland, the petitioner must demonstrate there is a reasonable probability the outcome of the trial would have been different. Accordingly, the uncalled witness must have been central to the defense, and it must appear reasonably probable that the defendant would not have been convicted had the witness been called.
 "After reviewing the petition and the supporting materials, we have concluded that Brant has demonstrated substantive grounds for relief, under R.C. 2953.21(C), by showing the testimony of Dr. Kolaczewski was critical to his defense. Had she been called, it is arguable there is a reasonable probability Brant would not have been convicted." Id. at 9-10.
This court also noted that, while the doctrine of resjudicata prevented revisiting the issues raised in the direct appeal, in light of counsel's failure to call an available expert witness to rebut the state's expert, the errors addressed therein were more prejudicial than they appeared at that time. The prejudice of those errors was measured against the strength of the remaining evidence and testimony, a key part of which went unrebutted. The cumulative effect of counsel's failure to call an expert witness to impeach the opinion testimony of Nurse Abbott combined with the other errors "severely undermined" our confidence in the verdict.Id. at 12. On April 20, 1998, the case was remanded for a hearing to fully investigate the merits of Brant's ineffective assistance of counsel claim.
On December 4, 1998, the trial court conducted the postconviction relief hearing. Brant, Dr. Kolaczewski, and Brant's trial counsel, George Keith ("Keith") testified. Brant testified that Keith told him they would need an expert witness to rebut the State's expert on the issue of forced penetration. Brant's mother worked in a doctor's office, and Brant volunteered that he may be able to provide the expert. Brant then took copies of the reports and met with Dr. Kolaczewski. Dr. Kolaczewski reviewed the reports. Brant gave Keith her phone number, and Dr. Kolaczewski made herself available by canceling all other appointments on the two days she anticipated being called to testify.
Dr. Kolaczewski testified that the symptoms indicated in the medical reports with regard to Ms. Ondayko's genital area are not uncommon, and that, in fact, she sees similar symptoms in the regular check-ups of her patients "all the time." She stated the symptoms could be caused by tight clothing, pantyhose, poor hygiene, sitting on a bicycle seat, sitting on a hard surface for a long time, or excess moisture. She testified that the laceration indicated was a "superficial" laceration, meaning very much on the surface, and it was located on the external genitalia. She testified this could be caused by a fingernail, clothing rubbing against it, inserting a "tampax" or pad, or a number of other things. She stated this is seen in normal and abnormal exams. She testified in her opinion she did not think the lesion was abnormal. She also noted the report stated the hymen was still intact, which is usually the case in virgins. She noted the absence in the report of any indications of bruising or scratching between the thighs, and also the absence of bruising or trauma anywhere else on the victim's body, which would be consistent with force. She concluded that, in her opinion, Ms. Ondayko was not subjected to forced sexual penetration.
Attorney Keith testified he was aware of Dr. Kolaczewski's availability before the trial began. However, in his evaluation of the case, he concluded the issue at trial was not going to be whether an act of intercourse occurred, but that the issue was going to be whether it was a consensual act. Keith concluded that the testimony of Nurse Abbott would not present an issue that would "concern the jury," as Brant was going to admit intercourse occurred. Therefore, he opted not to call an expert witness and instead determined to rely on cross-examination of Nurse Abbott.
On April 6, 1999, the trial court entered judgment denying Brant's petition for postconviction relief. The court only addressed the potential testimony of Dr. Kolaczewski, and not any of the other issues raised in the petition. Brant's attorney did not submit any evidence on these other issues at the hearing. The court concluded there was not a reasonable probability the jury would not have convicted Brant had the testimony of the doctor been heard. The court reasoned that the jury found there was force connected with all of the sexual conduct that night, and that conclusion was in the jury's sole province to make. The court found there was ample evidence to support that finding. The court concluded that the doctor's testimony did not impeach Ondayko's testimony that, whether or not there was vaginal penetration, that it hurt "real bad." The court noted that semen was found in the victim's vagina that matched the defendant's. The court noted that Dr. Kolaczewski did not testify that she knew the legal standard for vaginal intercourse, i.e. that penetration, however slight, is sufficient to constitute vaginal intercourse. In fact, neither party ever asked the doctor what the legal standard was, rather, the questioning was directed at her analysis of the symptoms as they related to the issue of force. Finally, the court reasoned that Nurse Abbott had greater training in the area of sexual abuse, and had the benefit of directly examining Ondayko after the incident, as opposed to simply reviewing the medical records. Based upon those reasons, the court denied the petition. From this judgment, Brant timely filed notice of appeal, assigning the following error:
 "The trial court erred and violated the appellant's constitutional rights in denying his motion for postconviction relief because appellant stated a prima facie case of ineffective assistance of counsel and is therefore entitled to a new trial."
To establish a claim for ineffective assistance of counsel, the defendant must prove that counsel's performance fell below an objective standard of reasonable representation and that prejudice arises from counsel's performance.Bradley, supra, at paragraph two of syllabus. To show prejudice in this sense, the petitioner must demonstrate that there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Id., paragraph three of syllabus; State v. Brant (Apr. 17, 1998), Portage App. No. 97-P-0019, unreported, at 8, citing Strickland v Washington (1984), 466 U.S. 668. As a postconviction relief proceeding is a collateral civil attack on a judgment, the judgment of the trial court is reviewed under the abuse of discretion standard. Statev. Apanovitch (1995), 107 Ohio App.3d 82, 87.
Brant has presented five issues for review within his assignment of error. As the resolution of the fifth issue, which addresses the trial court's conclusion that there was not a reasonable probability the outcome of the trial would have been different had Dr. Kolaczewski testified, is dispositive of this appeal, we shall address that first.
Initially, we must note that in its brief the state cites State v. Nicholas (1993), 66 Ohio St.3d 431, 436, citingState v. Thompson (1987), 33 Ohio St.3d 1, 10-11, for the proposition that the failure of defense counsel to call an expert witness and instead to rely on cross-examination of the state's expert does not constitute ineffective assistance of counsel. InThompson, the court concluded it did not constitute ineffective assistance because under the circumstances of that case the court determined "the errors alleged by appellant were neither so serious that his counsel were not functioning as the `counsel' guaranteed by the Sixth Amendment, nor so serious that the result of his trial was rendered unreliable." Id. at 11. The conclusions in Nicholas and Thompson were based on the facts and circumstances of those cases, and the cases did not set forth a rule of universal application (syllabus law), although they clearly would ratify a like conclusion in a like case. This court must still apply the Bradley analysis to the facts and circumstances of this case and determine if failure to call an expert in this case was prejudicial to the defense. Likewise, by no means should this court's opinion in this case be cited for a general proposition that failure to call an expert is per se
ineffective assistance of counsel. Our conclusion in this case is supported by the facts of this case.
Attorney Keith's analysis concluding that the key issue of this case was consent is correct. Given that the DNA proved sexual conduct occurred, and also that Brant intended to testify they had sexual relations, consent was the only issue. However, his analysis with regard to the testimony of Nurse Abbott was incorrect. Keith testified he did not believe Nurse Abbott's testimony would "concern the jury," because he apparently believed her testimony would merely establish something which Brant intended to freely admit, that sexual conduct occurred. This analysis totally overlooks the fact that Nurse Abbott's testimony was being offered not so much to establish conduct which occurred, but to establish the nature of that conduct. The most critical part of Nurse Abbott's testimony was her informing the jury that in her opinion as an expert, the physical evidence establishes that there was forced penetration. Forced penetration is inconsistent with consent. Due to defense counsel's misunderstanding of the import of Nurse Abbott's testimony, his performance was flawed.
In the context of this trial, the single, clear, and only implication of the use of the term force was that it was the abrogation of consent. The use of both terms was directed solely at the issue of whether the sexual conduct that occurred was consistent with the will and wishes of Ms. Ondayko. The only witnesses whose testimony was relevant to the issue of consent were Ondayko, Brant, and Nurse Abbott. As between Ondayko and Brant, the word of Ondayko was backed up by an expert whose status as an expert lends her testimony special credibility with a jury. The critical nature of Nurse Abbott's testimony, as it related to the outcome of this trial, is enhanced by the fact that the injuries or condition of Ondayko's genital region were not at all severe, rather, they were slight to the point that the causation was debatable. Consequently, we must conclude that it is not debatable that counsel should have called an available expert who would have testified that the physical evidence does not indicate forced sexual penetration. We can conceive of no reasonable strategy that neglects to utilize this asset.
The state argues that the physical evidence related to forced sexual penetration is largely irrelevant because Brant was convicted of the two other forms of rape, which, sequentially, occurred first. Those crimes would not involve any injury to Ondayko's genitalia. However, the three crimes were tried together. The key issue was consent. In Strickland, supra, the court, in providing guidance for the analysis of prejudicial effect, stated:
 "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (Emphasis added.) Id. at 695.
The expert testimony corroborating forced penetration lent great credibility to Ondayko's version of events, which otherwise had some credibility gaps. It was the only "objective" testimony supporting one person's word over the other's. Consent, in this case, could be considered an all or nothing proposition. One party testified all the conduct was consensual, and the other party testified none of it was consensual. The versions are mutually exclusive. Facts tending to prove a lack of consent to one act were consequently probative of the issue on the other acts. Thus, physical evidence tending to establish the use of force in one of the acts was not irrelevant to determination of the issue with respect to the other acts.
The failure of counsel to call an available expert witness in rebuttal fell below an objective standard of reasonable representation. The remaining issue is whether the failure was prejudicial to the defense. In this analysis, the court must consider the totality of all the evidence before the judge or jury. Bradley, supra, at 142, citing Strickland. We must conclude that counsel's errors were prejudicial.
"To warrant reversal, `[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Bradley,supra at 142, quoting Strickland, supra at 694. This court has no opinion regarding Brant's guilt or innocence. In analyzing the probability of a different outcome, it must be borne in mind that the outcome is determined by whether all the elements of the offense have been proved beyond a reasonable doubt. The analysis of the probability of a different outcome must be directed to that standard.
Bradley, in adopting the Strickland analysis, has defined a reasonable probability as a probability sufficient to undermine confidence in the outcome. In other words, in viewing the totality of the evidence before the jury, are we confident that every element of the crime has been proven beyond a reasonable doubt? In contemplating the evidence before the jury in the context of this analysis, we must consider that the errors have been corrected.
The state presented two witnesses whose testimony was related to the key issue of consent, Ms. Ondayko and Nurse Abbott. In the final analysis, this case boiled down to the word of Ondayko versus that of Brant. In the trial, Ondayko's word was supported by the testimony and conclusion drawn by Nurse Abbott, whose status as an expert lent it special credibility. In evaluating the probability of a different outcome, we must consider that this testimony has been countered by the testimony of a defense expert. The state has the burden of proving guilt beyond a reasonable doubt. The testimony of a defense expert addressing the physical evidence and concluding it indicated an absence of force may go a long way towards raising that doubt. We conclude that if Brant had presented a medical expert at trial there is a reasonable probability the trial would have resulted in a different outcome.
The confidence we hold in the outcomes of trials in our criminal justice system is predicated upon the fairness of the process. When we can look at the process and conclude it was fair, then we can likewise conclude that substantial justice has been done. If the process was fundamentally flawed, then we cannot have confidence in the outcome, and we cannot conclude that substantial justice has been done. In evaluating an ineffective assistance of counsel claim, to have confidence in the verdict, we must be able to conclude that substantial justice has been done. In this case, we cannot reach that conclusion.
We reverse the judgment of the trial court and remand the matter for a new trial. The defense may call Dr. Kolaczewski or another expert of their choice, subject to the Ohio Rules of Evidence.
Consistent with this opinion, it is the finding of this court that because of a certain expression made by the trial judge during the course of these proceedings, we suggest that another judge be assigned to this matter.
 _______________________________ JUDGE WILLIAM M. O'NEILL
FORD, P.J., NADER, J., concur.