OPINION *Page 2 
{¶ 1} On September 15, 2005, the Richland County Grand Jury indicted appellant, Shawnta Reese, on one count of aggravated burglary in violation of R.C. 2911.11 and one count of felonious assault in violation of R.C. 2903.11. Said charges arose from an incident wherein appellant went to the home of the victim, Sally Kegley, broke down the door and attacked Ms. Kegley.
 {¶ 2} Appellant was found guilty after a jury trial. This court reversed that conviction and remanded the case for a new trial finding the trial court erred in finding the victim, Sally Kegley, was unavailable pursuant to Evid. R. 804(A) (5) and admitting Ms. Kegley's preliminary hearing testimony at trial. See, State v. Reese, Richland App. No. 06CA45, 2007-Ohio-1082.
 {¶ 3} Appellant's re-trial commenced September 17, 2007. Appellant was found guilty of aggravated burglary. However, the jury was unable to reach a verdict on the charge of felonious assault. The trial court sentenced appellant to four years in prison.
 {¶ 4} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:
 {¶ 5} "I. BY APPEARING AT A JURY TRIAL IN JAIL-ISSUED CLOTHING, THE DEFENDANT WAS PREJUDICED AND DENIED THE RIGHT TO A FAIR TRIAL.
 {¶ 6} "II. APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S FAILURE TO OBJECT TO THE JAIL ATTIRE, FAILURE TO REQUEST THE TRIAL COURT ADMONISH THE JURY CONCERNING APPELLANT'S ATTIRE, AND FAILING TO PRESERVE THE RECORD ON APPEAL." *Page 3 
 I. {¶ 7} In the First Assignment of Error, appellant contends that the trial court committed plain error when it allowed the matter to proceed to trial with appellant attired in a green jump suit issued by the jail. We disagree.
 {¶ 8} At the outset, we note that nowhere in the trial court's record of appellant's case is her attire referred to or identified as clothing that was issued by the jail. Nor is the attire of appellant even described in any detail. The only reference to the clothing worn by appellant comes when she is identified by the State's witnesses as wearing "the green jumpsuit." (T. at 118; 138). A review of the record indicates that no objection challenging the attire of the appellant appears affirmatively on the record.
 {¶ 9} "The general rule is that `an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' State v. Childs (1968), 14 Ohio St. 2d 56
[43 O.O.2d 119], 236 N.E.2d 545, paragraph three of the syllabus; State v.Glaros (1960), 170 Ohio St. 471 [11 O.O.2d 215], 166 N.E.2d 379, paragraph one of the syllabus; State v. Lancaster (1971),25 Ohio St.2d 83 [54 O.O.2d 222], 267 N.E.2d 291, paragraph one of the syllabus;State v. Williams (1977), 51 Ohio St.2d 112, 117 [5 O.O.3d 98],364 N.E.2d 1364. Likewise, `[c]onstitutional rights may be lost as finally as any others by a failure to assert them at the proper time.' State v.Childs, supra, 14 Ohio St.2d at 62 [43 O.O.2d 119], 236 N.E.2d 545, citing State v. Davis (1964), 1 Ohio St.2d 28 [30 O.O.2d 16],203 N.E.2d 357; State, ex rel. Specht, v. Bd. of Edn. (1981), 66 Ohio St.2d 178,182 [20 O.O.3d 191], 420 N.E.2d 1004, citing Clarington v. Althar
(1930), *Page 4 122 Ohio St. 608, 174 N.E. 251, and Toledo v. Gfell (1958),107 Ohio App. 93, 95 [7 O.O.2d 437], 156 N.E.2d 752. [Footnote omitted.] Appellant's claim was apparent but yet not made at the trial court level." State v. 1981 Dodge Ram Van (1988), 36 Ohio St.3d 168, 170,522 N.E.2d 524.
 {¶ 10} Assuming arguendo that appellant did in fact appear at her jury trial in jail-issued clothing we would nonetheless be compelled to overrule her assignment of error.
 {¶ 11} The United States Supreme Court has held that a defendant's right to due process is violated when he is compelled to appear at trial wearing identifiable prison clothing. Estelle v. Williams (1976),425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126. The court reasoned, in part, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." Id. at 504-05. The Supreme Court, however, declined to establish a per se rule that invalidated a conviction whenever the accused wore jail clothing at trial. Id.; See, also, State v. Dorsey (Apr. 23, 1998), Cuyahoga App. No. 72177. Rather, when a defendant wears prison attire before the jury, the relevant inquiry is whether he was compelled to do so. Estelle v.Williams, supra 425 U.S. at 507.
 {¶ 12} There is no objection to appellant's attire on the record. Thus, we may not reverse the conviction unless we find plain error. In criminal cases, plain error is governed by Crim. R. 52(B), which states:
 {¶ 13} "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An alleged error "does not constitute a plain error . . . unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Long (1978), 53 Ohio St. 2d 91, 372 N.E. 2d 804, *Page 5 
paragraph two of the syllabus. The Supreme Court has repeatedly admonished that this exception to the general rule is to be invoked reluctantly. "Notice of plain error under Crim. R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus. See, also, State v. Thompson (1987), 33 Ohio St.3d 1, 10,528 N.E.2d 542; State v. Williford (1990), 49 Ohio St.3d 247, 253,551 N.E.2d 1279 (Resnick, J., dissenting).
 {¶ 14} The Estelle court stated as follows, "The reason for this judicial focus upon compulsion is simple; instances frequently arise where a defendant prefers to stand trial before his peers in prison garments. The cases show, for example, that it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury." Estelle, supra, at 508.
 {¶ 15} The Estelle court further stated that, "Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system." Estelle v. Williams, 425 U.S. at 512, 96 S.Ct. at 1697.
 {¶ 16} We find that the record fails to demonstrate that appellant was compelled to wear jail clothing during the trial. In fact, there is no objection to appellant's attire on the record.
 {¶ 17} In this case, we find no plain error.
 {¶ 18} Appellant's First Assignment of Error is overruled. *Page 6 
 II. {¶ 19} In her Second Assignment of Error, appellant argues that she was denied effective assistance of trial counsel when trial counsel failed to object to the matter proceeding to trial when appellant was attired in a jail jump suit, failed to request a cautionary jury instruction and failed to preserve the record for appeal. We disagree.
 {¶ 20} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. Lockhart v. Fretwell (1993), 506 U.S. 364,113 S.Ct. 838, 122 L.Ed. 2d 180; Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 21} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley, 42 Ohio St. 3d at 142,538 N.E. 2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
 {¶ 22} In order to warrant a reversal, the appellant must additionally show she was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra, at syllabus at paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the *Page 7 
outcome. Id. The United States Supreme Court and the Ohio Supreme Court have both held that a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."Bradley, 42 Ohio St.3d at 143, 538 N.E.2d 373 (citingStrickland, 466 U.S. at 697).
 {¶ 23} We do not find that trial counsel's failure to object or to request a cautionary jury instruction constitutes ineffective assistance of counsel. As stated previously, there is no indication that appellant was required to wear jail attire. As such, the wearing of jail attire could be considered a trial strategy. Appellant's counsel may have been attempting to invoke a sense of sympathy for appellant's plight. SeeEstelle, supra. at 508. "Judicial scrutiny of counsel's performance is highly differential, and reviewing courts must refrain from second guessing the strategic decisions of trial counsel." State v. Sallie
(1998), 81 Ohio St. 3d 673, 674, 693 N.E.2d 267. Trial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel. State v. Clayton (1980), 62 Ohio St. 2d 45, 402 N.E.2d 1189. The Estelle court further stated that, "Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Any other approach would rewrite the duties of trial judges and counsel in our legal system."Estelle v. Williams, 425 U.S. at 512, 96 S.Ct. at 1697.
 {¶ 24} Further, appellant failed to show that she was prejudiced by the jail attire. The evidence against appellant was overwhelming. *Page 8 
 {¶ 25} The victim, Sally Kegley, testified that she first met the appellant through the appellant's boyfriend, Elgie Knighten. (T. at 83). She indicated that her impression of the appellant was that she was a "very, very sweet lady." (T. at 84).
 {¶ 26} On the evening of August 20, 2005, Ms. Kegley testified that she was sitting on the couch in her apartment, talking to Elgie Knighten. (T. at 84). Mr. Knighten was seated across the room in the rocking chair next to the television. (T. at 84). Around 9:00 p.m., there was a knock on the front door. (T. at 85-86). Ms. Kegley testified that when she asked who was at the door, no one answered. (T. at 85). At that point, she used some "colorful language," stating that if they were not going to say anything, she wanted them to get off her property or she would call the police. (Id.).
 {¶ 27} After Ms. Kegley told the person to get off her porch, there was another knock at the door. (T. at 86). Ms. Kegley responded "[n]ow who is it * * * You better get the F away from here." (T. at 86). At that time, appellant yelled through the window "[b]itch, you better open the door or I'm breaking it down. (T. at 86, 87). Appellant then cut through the screen door, which was locked, burst through the "big door," and entered Ms. Kegley's apartment. (T. at 86).
 {¶ 28} Once she was inside the apartment, Ms. Kegley testified that appellant jumped over the coffee table, and attacked her while she was seated on the couch. (T. at 86). She was able to wrestle appellant onto her back and get a chokehold on her when she felt something going down her arm. (T. at 87). While this was going on, Elgie Knighten told the appellant to stop, but the Appellant would not listen. Instead, she told Mr. Knighten that she was going to kill Ms. Kegley. (T. at 87-88). *Page 9 
 {¶ 29} Ms. Kegley testified that Mr. Knighten eventually separated her and the appellant. (T. at 88). At that point, she ran into her kitchen and grabbed an iron skillet. Ms. Kegley stated that she got the skillet because "if she was going to come at me, I was going to hit her with it." (T. at 88). However, she did not use the skillet, because Mr. Knighten was able to get appellant out of the house. (T. at 88).
 {¶ 30} Ms. Kegley testified that once appellant was outside, she went into her bedroom, sat on the floor, and used her cell phone to call the police. (T. at 88). She indicated that she went into her bedroom to make the phone call because the appellant was trying to come back into the house. (T. at 89). Ms. Kegley testified that after Mr. Knighten pulled appellant out of the door, the appellant was still after her, screaming "I'm going to kill you bitch." (T. at 89).
 {¶ 31} Because of the attack, Ms. Kegley testified that she suffered four cuts, including a cut on her neck, a cut on her shoulder going down her arm, and a cut on her forehead. (T. at 89). She indicated that she did not see the weapon. appellant used to slice her with, but it felt like a razor blade. (T. at 89). Ms. Kegley testified that paramedics treated her injuries on the scene, applying butterfly stitches on the cuts. However, she refused to go to the hospital because she was afraid to leave her house, which was wide open due to the broken door. (T. at 90-91). Ms. Kegley identified photographs of her injuries taken on August 20, 2005, and showed the jury the scars resulting from the wounds inflicted by appellant. (T. 89-90, 94-96).
 {¶ 32} Elgie Knighten testified that appellant was his girlfriend at the time of the incident. (T. at 111). He also testified that he knew the victim, Sally Kegley. (Id.). On August 20, 2005, Mr. Knighten testified that he and appellant met Sally Kegley at a bar. *Page 10 
(T. at 112). At some point, appellant left the bar to go to Mr. Knighten's mother's house to take a shower. (T. at 112). Mr. Knighten indicated that he planned to go to the store to buy beer and cigarettes, and then meet back up with appellant at Ms. Kegley's house later that evening. (T. at 112-113).
 {¶ 33} While he was at Sally Kegley's house, appellant came over and knocked on the door. (T. at 114). Mr. Knighten testified that appellant was upset because he had her phone. (T. at 114). Ms. Kegley refused to let appellant in, so the appellant forced herself inside, breaking off the hinges on the door. (T. at 114). After appellant got inside Ms. Kegley's house, Mr. Knighten testified that she and Ms. Kegley were "having some words." (T. at 114). The next thing he knew, appellant and Sally Kegley were "tussling." (T. at 114). Mr. Knighten indicated that he jumped between them, and held Ms. Kegley at bay. When Ms. Kegley grabbed a frying pan, he grabbed appellant and took her outside. (T. at 114).
 {¶ 34} Mr. Knighten testified that he did not see Ms. Kegley after the incident. (T. at 114-115). Mr. Knighten indicated that he did see scratches on Ms. Kegley resulting from the tussle between her and the appellant. (T. at 115). Mr. Knighten stated that while he was trying to separate the two women, appellant was saying she wanted her phone. (T. at 115). He testified that when he stepped between the two women, the struggle was over in about 30 seconds. (T. at 115).
 {¶ 35} After he grabbed the appellant, Mr. Knighten testified that he took her outside and they walked down Kentucky Avenue towards Grace Street. (T. at 115-116). While they were walking, he told appellant that she "didn't have to do that," and asked her why she cut Sally Kegley. (T. at 116). He also asked appellant what she used to cut *Page 11 
Ms Kegley with, because he did not see a weapon during the struggle. (T. at 116). When asked if he had given a statement to police that the appellant had a razor blade, Mr. Knighten admitted that he did make that statement "[b]ecause that's what I thought she had." (T. at 116-117). He stated, "I just figured it was a razor because just how sharp it was, basically." (T. at 117). When asked if the Appellant was injured in the struggle, Mr. Knighten stated "not that I noticed." (T. at 118).
 {¶ 36} Mr. Knighten indicated that Sally Kegley was cut on the arm during the struggle. (T. at 136, 128). He admitted that he told police she was cut with a razor. (T. at 128). Mr. Knighten also admitted that Sally Kegley was upset, shocked, and afraid when the appellant broke in the door of her apartment. (T. at 128-129).
 {¶ 37} Finally, Richland County Sheriff's Deputy James Sweat testified regarding his investigation into the incident on August 20, 2005. On that date, he was dispatched to the area of 482 Kentucky Avenue based upon a report of a stabbing in progress. (T. at 136). Deputy Sweat testified that as he was going north on Kentucky Avenue off of Grace Street, he passed a black male and a black female who were arguing as they walked down the street. (T. at 137). At that point, he did not know that they were involved in the stabbing call, so he proceeded to 482 Kentucky Avenue. (T. at 137).
 {¶ 38} Deputy Sweat testified that when he arrived at the residence where the stabbing was reported, a neighbor from across the street said that he heard some type of altercation, and saw the black male and black female that Deputy Sweat observed earlier leave the residence. (T. at 137). At that point, Deputy Sweat left the area to locate the male and female that he had observed walking down the street. (T. at 137). *Page 12 
He found them at the intersection of Pennsylvania Avenue and Grace Street, less than a quarter of a mile from 482 Kentucky Avenue. (T. at 138).
 {¶ 39} Deputy Sweat indicated that once his backup arrived, he took both individuals into custody. (T. at 138). They were identified as appellant and Elgie Knighten. (T. at 138-139). Based upon statements that Elgie Knighten was making, and the appellant's response that she was sorry, Deputy Sweat realized that there was an actual victim at 482 Kentucky Avenue. At that point, he took the appellant and Mr. Knighten back to the residence and made contact with the victim, Sally Kegley. (T. at 139).
 {¶ 40} Deputy Sweat testified that when he made contact with Ms. Kegley, she was crying, and nervous. She was frightened to the point where she was shaking, her face was red and flushed and she was panicky. (T. at 140). Deputy Sweat indicated, "[o]bviously, she was fearing for her safety." (T. at 140). He observed a laceration to Ms. Kegley's forehead, a laceration down the left side of her neck, left shoulder, and biceps area. (T. at 140). Deputy Sweat testified that the injury to the biceps area was the worst of the injuries. It was several inches long and several centimeters in width. (Id.). He testified that it "[b]asically, filleted open her biceps area." (Id.).
 {¶ 41} As to the appellant's demeanor at the scene, Deputy Sweat testified that she was initially sympathetic when he located her. (T. at 144-145). At that time, she was saying that she was sorry; however, when he continued to talk to her, the conversation became more confused. (T. at 145). Deputy Sweat testified that appellant began saying that she had no recollection of what happened, and that she just wanted her cell phone. (T. at 145). *Page 13 
 {¶ 42} Deputy Sweat indicated that he took a taped statement from appellant after she was read and waived her Miranda rights. (T. at 145). The tape of that statement was played for the jury, and was admitted into evidence as Court's Exhibit A. (Id).
 {¶ 43} Based upon the testimony set forth above, there was sufficient evidence for the jury to find appellant guilty of aggravated burglary. Both Sally Kegley and Elgie Knighten testified that the Appellant broke open the door of Sally Kegley's apartment at 482 Kentucky Avenue, and forced her way inside while they were present. The evidence also established that she broke into the apartment with the purpose to assault Sally Kegley. As the appellant's guilt was established by overwhelming evidence, any error resulting from her appearance in jail attire was harmless beyond a reasonable doubt. The fact that the jury was unable to reach a verdict on Count 2, felonious assault, is further evidence that they were not prejudiced by her appearance in jail-issued clothing.
 {¶ 44} The conduct raised by appellant does not rise to the level of prejudicial error necessary to find that she was deprived of a fair trial. Having reviewed the record that appellant cites in support of his claim that she was denied effective assistance of counsel, we find appellant was not prejudiced by defense counsel's representation of her. The results of the proceedings were not unreliable nor were the proceedings fundamentally unfair because of the performance of defense counsel.
 {¶ 45} Appellant's Second Assignment of Error is overruled. *Page 14 
 {¶ 46} The judgment of the Court of Common Pleas for Richland County, Ohio is affirmed.
 Gwin, J., Hoffman, P.J., and Wise, J., concur. *Page 15 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas for Richland County, Ohio is affirmed. Costs to appellant. *Page 1