OPINION *Page 3 
{¶ 1} Plaintiff-Appellant Rashad Thompson appeals the December 7, 2007, verdict entered in the Richland County Court of Common Pleas following a jury trial, finding that Defendant-Appellees Guy Capaldo, M.D. and Women's Care, Inc. had not violated the standard of care.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Karen Thompson was first seen by Defendant-Appellant Mansfield OB/GYN dba Women's Care, Inc. on April 15, 1986. At that time, she was 28 years of age and pregnant with her third child. Her first two children were delivered in 1978 and 1979. Her estimated due date was calculated to be October 2, 1986. During her pregnancy, she saw various physicians at Women's Care, as is customary in many obstetrical practices.
 {¶ 3} On or about October 12, 1986, Karen Thompson was admitted to Mansfield General Hospital for the delivery of her third child. (T. Vol. III at 458). Defendant-Appellant Guy Capaldo, M.D., one of the doctors in the Mansfield Obstetrics and Gynecology group, was handling the deliveries at the facility that day. Prior to that date, he had never met the mother. Id.
 {¶ 4} Ms. Thompson was in labor when she arrived at the hospital at around 6:30 a.m. but did not enter the active or second stage of labor until approximately 9:30 a.m. The active phase of labor begins when a woman's cervix is 4 cm. dilated and continues until the cervix is fully dilated at 10 cm., at which time she is instructed to begin pushing. *Page 4 
 {¶ 5} At approximately 10:47 a.m., Dr. Capaldo applied forceps for the first time in an effort to assist in delivery of Appellant Rashad Thompson's head. He applied forceps because of concerning decelerations on the fetal heart monitor and because Ms. Thompson was tiring and having difficulty continuing to push. He applied the forceps on three occasions and delivered the head after the final forceps application at 10:58 a.m. (T. at 878-879, 911). The records reflect that Appellant's umbilical cord was loosely wrapped around his neck and was released by Dr. Capaldo. He suctioned Appellant's nose and mouth, which is a standard maneuver to prevent the infant from inhaling blood, mucous and other fluids once the body is delivered and the infant takes his initial breath. (T. at 872-873). The records reflect that Appellant was delivered two minutes after his head was delivered. In the nursery, Appellant's left arm was noted to be limp, and he has since been diagnosed with a permanent left brachial plexus injury.
 {¶ 6} Appellant's theory was that the left brachial plexus injury was due to a shoulder dystocia at the time of delivery. Shoulder dystocia is an obstetrical emergency in which one of the baby's shoulders becomes stuck under the pubic bone or sacral prominence after the head is delivered, making it more difficult to accomplish delivery. (T. at 422, 723).
 {¶ 7} On June 6, 2005, Appellant Rashad Thompson, then eighteen years old, filed a medical negligence action against Appellees, Guy Capaldo, M.D. and Mansfield OB/GYN dba Women's Care, Inc. alleging that negligence by Appellees at the time of his birth resulted in permanent injury to his left brachial plexus, which is a *Page 5 
bundle of nerves arising in the neck and supplying motor and sensory functions to the arm, resulting in limited use of his left arm.
 {¶ 8} On June 30, 2005, Appellees filed an Answer to Appellant's Complaint and the parties proceeded with discovery.
 {¶ 9} On November 29, 2007, trial commenced in the Richland County Court of Common Pleas. Appellant was twenty-one years old at the time of trial.
 {¶ 10} On December 7, 2007, the jury returned its unanimous verdict in favor of Appellees, finding in response to Jury Interrogatory No. 1 that Dr. Capaldo had not been negligent in the care and treatment provided at the time of Appellant's birth. It is from that verdict that Appellant now seeks review by this Court.
 {¶ 11} Appellant now raises the following assignments of error:
 ASSIGNMENTS OF ERROR {¶ 12} "I. A NEW TRIAL IS NECESSARY BECAUSE OF THE TRIAL JUDGE'S REFUSAL TO PROHIBIT DEFENDANT-APPELLEES FROM UTILIZING A PEREMPTORY CHALLENGE TO REMOVE THE ONLY AFRICAN-AMERICAN JUROR FROM THE PANEL.
 {¶ 13} "II. THE TRIAL JUDGE ABUSED HIS DISCRETION BY PROHIBITING PLAINTIFF-APPELLANT FROM IMPEACHING THE DEFENDANT AND HIS EXPERTS WITH NURSES' NOTES FROM A SIMILAR DELIVERY INVOLVING SHOULDER DYSTOCIA.
 {¶ 14} "III. THE TRIAL JUDGE ABUSED HIS DISCRETION BY PROHIBITING PLAINTIFF FROM CROSS-EXAMINING A DEFENSE EXPERT WITH A PROPERLY AUTHENTICATED LEARNED TREATISE. *Page 6 
 {¶ 15} "IV. A FURTHER ABUSE OF DISCRETION WAS COMMITTED WHEN THE TRIAL JUDGE REFUSED TO ALLOW PLAINTIFF TO QUESTION THE DEFENDANT AND HIS EXPERTS ABOUT THE OBSTETRICIAN'S EXCEEDINGLY HIGH COMPLICATION RATE.
 {¶ 16} "V. THE TRIAL JUDGE ERRED, AS A MATTER OF LAW, BY INSTRUCTING THE JURY THAT THEY WERE NOT TO CONSIDER THE OUTCOME OF THE DELIVERY IN DETERMINING WHETHER THE STANDARD OF CARE HAD BEEN VIOLATED."
 I. {¶ 17} In his first assignment of error Appellant asserts that the trial court erred in allowing Defendants-Appellees to use a peremptory challenge to remove Patrice Rowe, an African-American juror, from the panel. We disagree
 {¶ 18} In order to state a prima facie case of purposeful discrimination under Batson, supra, an accused must demonstrate: (1) that members of a recognized racial group were peremptorily challenged; and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors on account of their race. Although Batson is a criminal case, a private litigant in a civil case is also precluded from using peremptory challenges to exclude jurors on account of race.
 {¶ 19} Whenever a party opposes a peremptory challenge by claiming racial discrimination "[a] judge should make clear, on the record, that he or she understands and has applied the precise Batson test when racial discrimination has been alleged in *Page 7 
opposition to a peremptory challenge." Hicks v. Westinghouse MaterialsCo., supra, 78 Ohio St.3d at 99.
 {¶ 20} In Hicks, supra, the Ohio Supreme Court set forth theBatson test as follows:
 {¶ 21} "The United States Supreme Court set forth in Batson the test to be used in determining whether a peremptory strike is racially motivated. First, a party opposing a peremptory challenge must demonstrate a prima-facie case of racial discrimination in the use of the strike. Id. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. To establish a prima-facie case, a litigant must show he or she is a member of a cognizable racial group and that the peremptory challenge will remove a member of the litigant's race from the venire. The peremptory-challenge opponent is entitled to rely on the fact that the strike is an inherently `discriminating' device, permitting `those to discriminate who are of a mind to discriminate'. State v. Hernandez (1992),63 Ohio St.3d 577, 582, 589 N.E.2d 1310, 1313, certiorari denied (1992),506 U.S. 898, 113 S.Ct. 279, 121 L.Ed.2d 206. The litigant must then show an inference of racial discrimination by the striking party. The trial court should consider all relevant circumstances in determining whether a prima-facie case exists, including all statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present. See, Batson at 96-97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. Assuming a prima-facie case exists, the striking party must then articulate a race-neutral explanation `related to the particular case to be tried.' Id. at 95, 106 S.Ct. at 1724, 90 L.Ed.2d at 88. A simple affirmation of general good faith will not suffice. However, the explanation `need not rise to the level justifying exercise of a *Page 8 
challenge for cause.' Id. at 97, 106 S.Ct. at 723, 90 L.Ed.2d at 88. The critical issue is whether a discriminatory intent is inherent in counsel's explanation for use of the strike; intent is present if the explanation is merely pretext for exclusion based on race. Hernandez v.New York (1991), 500 U.S. 352, 363, 111 S.Ct. 1859, 1868,114 L.Ed.2d 395, 409. 78 Ohio St.3d. 98-9.
 {¶ 22} Although the striking party must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive or even plausible"; so long as the reason is not inherently discriminatory, it suffices. Purkett v. Elem (1995),514 U.S. 765, 767-768, 115 S.Ct. 1769. (per curiam); Rice v.Collins (2006), 546 U.S. 333, 126 S.Ct. 969, 973-74.
 {¶ 23} Last, the trial court must determine whether the party opposing the peremptory strike has proved purposeful discrimination. Purkett v.Elem (1995), 514 U.S. 765, 766-767, 115 S.Ct. 1769, 1770. It is at this stage that the persuasiveness, and credibility, of the justification offered by the striking party becomes relevant. Id. at 768,115 S.Ct. at 1771. The critical question, which the trial judge must resolve, is whether counsel's race-neutral explanation should be believed.Hernandez v. New York, 500 U.S. at 365, 111 S.Ct. at 1869; State v.Nash (August 14, 1995), Stark App. No. 1995 CA 00024. This final step involves evaluating "the persuasiveness of the justification" proffered by the striking party, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, supra, at 768, 115 S.Ct. 1769; Rice v. Collins, supra at 126 S.Ct. 974.
 {¶ 24} It is irrelevant how many minority jurors remain on the panel if even one is excluded because of race. State v. Bryant, supra,104 Ohio App.3d 512; State v. Tuck *Page 9 80 Ohio App 3d 721, 724 (Batson, applicable even if there is only one African-American juror on the panel); Jones v. Ryan (CA. 3, 1993),987 F.2d 960, 972; United States v. David (C.A. 11, 1986), 803 F.2d 1567.
 {¶ 25} On direct appeal in federal court, the credibility findings a trial court makes in a Batson inquiry are reviewed for clear error.Hernandez v. New York, 500 U.S. 352, 364-366, 111 S.Ct. 1859,114 L.Ed.2d 395 (1991) (plurality opinion) (holding that evaluation of a prosecutor's credibility "lies `peculiarly within a trial judge's province'"). Rice v. Collins, supra at 126 S.Ct. 974.
 {¶ 26} Appellant in this matter is African-American and Ms. Rowe, the challenged juror in this matter, was the only African-American juror on the jury panel. Appellant argues that such peremptory challenge was racially discriminatory pursuant to Batson v. Kentucky (1986),476 U.S. 79.
 {¶ 27} In the case at bar, Appellees voluntarily explained their reasons for the peremptory challenge against Ms. Rowe. Hicks v.Westinghouse, supra, 78 Ohio St.3d at 100; State v. Hernandez, supra,63 Ohio St.3d at 583; Hernandez v. New York, supra; State v. Nash, supra.
 {¶ 28} "* * *. Your Honor, the reasons include the fact that Mrs. [sic] Rowe is a single mother similar in nature to this particular case. The other side has brought out the fact that their client was a single mother. Also, I believe that Mrs. [sic] Rowe testified in — at one point there was somebody, either family or friends, that had some sort of injury. In addition, I believe that her position as a salesperson selling cars is not something that I would view as being of the more conservative basis. She's on a sales commission. I don't view that as being one of the more traditional, conservative *Page 10 
occupations. Those are the — some of the primary reasons that I wanted her excused on a peremptory basis." (T. Vol. I at 169-170).
 {¶ 29} The trial court then conducted a sidebar, during which Appellee additionally argued that Juror Rowe should be removed because she had disclosed in her jury questionnaire that she had been involved in a lawsuit following an automobile accident. (T. Vol. I at 171-172).
 {¶ 30} Each of the above reasons gave Appellees legitimate, race-neutral bases for exercising a peremptory challenge to remove Juror Rowe from the venire.
 {¶ 31} "The trial judge is best placed to consider the factors that underlie credibility: demeanor, context, and atmosphere. And the trial judge is best placed to determine whether, in a borderline case, a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision. Appellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision about likely motivation. These circumstances mean that appellate courts will, and must, grant the trial courts considerable leeway in applying Batson." Rice v. Collins, supra at 126 S.Ct. at 977. (Breyer, J., concurring).
 {¶ 32} We do not find that the dismissal of Juror Rowe was clearly erroneous. We find that the reasons provided by defense counsel prior to exercising a peremptory challenge to excuse Juror Rowe were racially neutral.
 {¶ 33} Based on the foregoing, Appellant's first assignment of error is overruled.
 II. {¶ 34} In his second assignment of error Appellant argues that the trial court erred in not allowing Plaintiff-Appellant to impeach Defendants-Appellees and their *Page 11 
experts with nurses' notes from a similar delivery involving shoulder dystocia. We disagree.
 {¶ 35} In the case sub judice, the actions of the doctor, which Appellant is alleging constituted medical malpractice, occurred more than twenty (20) years prior to the trial in this matter. In order to prepare for the trial, Appellee and his experts reviewed the medical delivery records which included the dictation notes, the intrapartum record and the nurses' notes.
 {¶ 36} In the case sub judice, the nurses' notes did not contain any references to shoulder dystocia. Appellant sought to impeach and/or cross-examine Appellee and his experts with nurses' records from another one of Dr. Capaldo's patients who suffered a permanent brachial plexus injury, in an attempt to show that it was not unusual for the nurses' notes to not include any reference to dystocia, even in cases where dystocia did occur. (T. at 765). The trial court refused to allow these medical records to be used for that purpose. (T. at 765-767).
 {¶ 37} The admission or exclusion of evidence lies in the trial court's sound discretion. State v. Sage (1987), 31 Ohio St.3d 173,510 N.E.2d 343. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 38} Upon review, we do not find that the trial court abused its discretion refusing to allow the nurses' notes from another patient's case be used in this case. We find that such evidence was not relevant in this case. Just because dystocia did occur in *Page 12 
one other case where the nurses may have failed to include it in their notes does not prove that the same thing occurred in the case sub judice.
 {¶ 39} Even if relevant, we find pursuant to Evid. R. 403, that allowing the introduction of same would have been more prejudicial than probative
 {¶ 40} Based on the foregoing, Appellant's second assignment of error is overruled.
 III. {¶ 41} In his third assignment of error Appellant argues that the trial court erred when it prohibited Plaintiff-Appellant from cross-examining a defense expert with a properly authenticated learned treatise. We disagree.
 {¶ 42} In Stinson v. England (1994), 69 Ohio St.3d 451, the Ohio Supreme Court held:
 {¶ 43} "In Ohio, a learned treatise may be used for impeachment purposes to demonstrate that an expert witness is either unaware of the text or unfamiliar with its contents. Moreover, the substance of the treatise may be employed only to impeach the credibility of an expert witness who has relied upon the treatise, Hallworth v. Republic SteelCorp., supra, 153 Ohio St. at 355-356, or has acknowledged its authoritative nature."
 {¶ 44} In the instant case, Appellee presented the testimony of Dr. Ira Abbott, as their pediatric neurosurgical expert. Dr. Abbott testified that a pediatric neurosurgeon deals with the surgical management of diseases of the nervous system in children. (T. at 795). Dr. Abbott testified on direct examination that he did not have an opinion as to what causes brachial plexus injuries, that he was not an expert on labor and delivery *Page 13 
injuries, and that he was not familiar with the standard of care in regard to the delivery of a baby by an OB/GYN. (T. at 802-804). Instead, Dr. Abbott's expert testimony focused on the nature and extent of Appellant's injury and his finding and conclusions as to the extent of his disabilities and limitations as such pertained to damages. (T. at 804).
 {¶ 45} Appellant, upon cross-examination, sought to establish a foundation on which to impeach Dr. Abbott's credibility by challenging him with the textbook Volpe's Neurology of the Newborn, which addressed the causes of brachial plexus injuries. (T. at 830). In response, Dr. Abbott testified that he was not familiar with the text. Id. Upon objection, the trial court conducted a sidebar, at the conclusion of which the trial court sustained the objection, finding that Dr. Abbott could not be asked "to agree or disagree with something he doesn't know anything about." (T. at 831).
 {¶ 46} Based on the fact that Dr. Abbott's field of expertise is as a pediatric neurosurgeon, not a neurologist, that he was not called to render an opinion as to standard of care or causation, and his statements that he was not familiar with the learned treatise in question, we find that the trial court did not err in refusing to allow Appellant's to impeach him through the use of such learned treatise.
 {¶ 47} Based on the foregoing, Appellant's third assignment of error is overruled.
 IV. {¶ 48} In the fourth assignment of error, Appellant argues that the trial court erred in refusing to allow him to question Defendant-Appellee and his experts about the obstetrician's complication rate. We disagree. *Page 14 
 {¶ 49} Appellant argues that he should have been allowed to challenge the competency of Dr. Capaldo by asking Appellees' expert a hypothetical wherein the expert was to assume that Dr. Capaldo had eight to ten shoulder dystocias of which he was aware and two cases where there has been permanent injury and dystocia claimed, would that expert question the competency of that doctor. (T. at 1072-1047).
 {¶ 50} Upon review we find that trial court did not abuse its discretion in not allowing such line of questioning. As the trial court stated, the issue before the jury was not Dr. Capaldo's competency as a doctor, who had been established as a well-qualified doctor even by Plaintiffs own experts (T. at 417, 550), but rather whether Dr. Capaldo recognized a shoulder dystocia in this particular case. (T. at 1074).
 {¶ 51} Based on the foregoing, Appellant's fourth assignment of error is overruled.
 V. {¶ 52} In his fifth assignment of error, Appellant argues that the trial court erred in instructing the jury that they were not to consider the outcome of the delivery in determining whether the standard of care had been violated. We disagree.
 {¶ 53} In reviewing jury instructions on appeal, we must examine the specific charge at issue in the context of the entire charge, not in isolation. State v. Thompson (1987), 33 Ohio St.3d 1, 13. Jury instructions are within the trial court's discretion, which we will not disturb absent an abuse of that discretion. State v. Guster (1981), 66 Ohio St.2d 266, 271. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217. *Page 15 
 {¶ 54} In this case, both parties had submitted proposed jury instructions to the trial court prior to trial, and the instructions went through a series of approximately six drafts. The instructions read to the jury by the trial court included the following:
 {¶ 55} "In determining whether Dr. Capaldo is negligent, you are to consider his conduct in light of the facts before him under the same or similar circumstances. You are not to evaluate his care based on theoutcome. You may consider Dr. Capaldo's care based on the then-known facts and existing state of medical knowledge at the time the events were occurring." (emphasis added). (T. at 1173).
 {¶ 56} After the above instructions were read but before the jury began deliberating, it was brought to the attention of the trial court that it read the fifth draft of the instructions to the jury rather than the sixth draft, which omitted the language: "[y]ou are not to evaluate his care based on the outcome."
 {¶ 57} In order to correct same, the trial court re-read the above instruction to the jury as follows:
 {¶ 58} "In determining whether or not Dr. Capaldo is negligent, you are to consider his conduct in light of all the facts before him under the same or similar circumstances and not to evaluate his care based on after-acquired information. You may consider Dr. Capaldo's care based on the then-known facts and the existing state of medical knowledge at the time the events were occurring." (emphasis added). (T. at 1188).
 {¶ 59} The written jury instructions given to the jury to use during deliberations contained the correct language. *Page 16 
 {¶ 60} On review, we have examined the instructions as a whole, and we find that they are fairly balanced and include accurate statements of the law. Accordingly, we cannot find that the trial court abused its discretion in giving this instruction.
 {¶ 61} Based on the foregoing, Appellant's fifth and final assignment of error is overruled.
 {¶ 62} For the foregoing reasons, the judgment of the Court of Common Pleas of Richland County, Ohio, is affirmed.
 Wise, J. Gwin, P. J., and Farmer, J., concur. *Page 17 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Richland County, Ohio, is affirmed. Costs assessed to Appellant. *Page 1