[Cite as *In re Adoption of R.L.A.*, 2024-Ohio-5218.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE ADOPTION OF R.L.A. | : | No. 113860 |
| A Minor Child | : | |
| [Appeal by Father, A.A.] | : | |
| | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 31, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Probate Division
Case No. 2021 ADP 09875

---

### *Appearances:*

Cullen Sweeney, Cuyahoga County Public Defender, and
Britta Barthol, Assistant Public Defender, *for appellant.*

Hilton Parker, LLC, Jonathan Hilton, and Geoffrey
Parker, *for appellee.*

MICHAEL JOHN RYAN, J.:

{¶ 1} The biological father appeals the trial court's decision that his consent for adoption of child, "R.L.A." ("the child"), was not necessary because he lacked justifiable cause for failure to provide more than de minimis contact and failure to

provide maintenance and support of the minor child during the relevant time frame. After a thorough review of the facts and the law, we affirm.

**Procedural History and Facts**

{¶ 2} The child was born on March 30, 2017; he is currently seven years old. The child has lived with the prospective adoptive father for his entire life, except for the first three days after his birth and a short period of time during his infancy.

{¶ 3} Prior to the child's birth, the biological mother ("Mother"), who was married to the biological father, met the prospective adoptive father and they agreed that the prospective adoptive father would raise the child.

{¶ 4} When the child was first born, Mother and the biological father gave the paternal grandmother guardianship over the child. When the child was three days old, however, he went to live with his prospective adoptive father.

{¶ 5} Mother and the biological father divorced in 2018. Mother filed to terminate the paternal grandmother's guardianship and give guardianship to the prospective adoptive father. Except for a short period of time when paternal grandmother took the child for paternity testing,[1] the child has resided solely with the prospective adoptive father. The prospective adoptive father's longtime partner also lives in the home and coparents the child with the prospective adoptive father.

{¶ 6} The prospective adoptive father filed a petition for adoption of the child on July 30, 2021. In the petition, he stated that the biological father's consent to the

---

[1] The record does not indicate how many days the child stayed with paternal grandmother.

adoption was not required because the father had failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor. Mother gave her consent for the adoption on March 3, 2022. On July 15, 2022, the biological father filed an objection to the petition for the adoption.

{¶ 7} On July 28, 2023, a magistrate held a hearing on the matter. The prospective adoptive father testified that he met Mother when she came to his place of employment as a customer. At the time, Mother was noticeably pregnant. They struck up a conversation and Mother told the prospective adoptive father that she was married, but her husband — the child's biological father — did not want anything to do with the child, so she would consider having a prospective adoptive father raise him. They exchanged phone numbers and continued to communicate. A few weeks prior to Mother's due date, the prospective adoptive father and Mother went shopping for baby items, which the prospective adoptive father purchased and placed in his home. It is uncontested that the prospective adoptive father has provided for all of the child's basic needs during the entirety of the child's life.

{¶ 8} According to the prospective adoptive father, the biological father has not seen the child since a 2018 guardianship hearing. The biological father has not contacted petitioner or the child and has not provided any financial support or gifts for the child. The prospective adoptive father testified that he has not stopped biological father from visiting or supporting the child and has not asked for financial support from the biological father. He further testified that he never acted nor asked

anyone else to act in a way that prevented the biological father from visiting the minor and that the paternal grandmother has visited the child.

{¶ 9} The prospective adoptive father testified that the paternal grandmother had the child for a short period of time to get paternity testing on the child completed and she knew where he lived and has visited the child. He also has regular contact with Mother, who comes to his house regularly to have her hair cut. The prospective adoptive father explained that he is a full-time stay-at-home father to the child and cuts hair out of his house.

{¶ 10} The prospective adoptive father admitted he had blocked the biological father on social media, but stated he did not block his phone number. He also testified that during the pandemic, his house was "closed" for the safety of the child. The prospective adoptive father was not asked, and did not testify, how long that closure lasted.

{¶ 11} The biological father testified that he inadvertently ran into the prospective adoptive father's partner at a bakery. According to biological father, he asked to see his son and the partner stated, "error, error, that's not your son," so father responded, "that's fine, I'll see you in court." The biological father stated he never filed to pay child support or for visitation and did not seek to look up petitioner's address online, because he did not know how to.

{¶ 12} The biological father testified that he currently has three minor children that reside with him.[2] He and the child's Mother were married at the time of the child's birth. At time of the child's birth, they gave guardianship to paternal grandmother. The biological father was caring for his two older children and working a full-time job. He and the child's Mother divorced in 2018.

{¶ 13} The biological father testified that he had not had contact with the child nor the prospective adoptive father since the 2018 guardianship hearing. At that hearing, where he was not represented by counsel, he told the court that he was unable to financially provide for the child.

{¶ 14} According to the biological father, he would have visited the child if he knew how to contact the prospective adoptive father. He testified that the child is on his lease, and he has a room for the child. He admitted he has never provided financially for the child.

{¶ 15} According to the biological father, at some point he asked Mother how he could get in contact with the prospective adoptive father, but Mother provided him with two incorrect phone numbers. Although the biological father claimed he did not know where the prospective adoptive father lived, he testified that he had been to his house. He testified that he got a call from his mother (paternal grandmother), who told him about the prospective adoptive father and his partner:

> So I got a call from my mother first, and then – that the kid was going to [prospective adoptive father and partner] . . . and she [paternal grandmother] went over there to grab him and that's when I found out

---

[2] The youngest child was born after Mother and the biological father divorced. The record does not indicate whether Mother is the biological mother of that child.

[about prospective adoptive father and partner]. And the[n] he showed me his house where [he] bought the crib and everything. And at the time I didn't know [the child] was mine until I did a DNA test.

. . .

And at the last place I knew they lived was on — — Blvd., like — — Street or something like that. But I don't remember the house, the address, or anything where basically that [is].

{¶ 16} When asked whether the house he visited was the address the prospective adoptive father put on his petition to adopt, the biological father stated that he did not know. The biological father said he was not close to his own mother, so he did not inquire if she knew where the child lived.

{¶ 17} The biological father's brother testified that his brother struggled financially during the pandemic. He knew that the biological father wanted the child to live with him and had moved into a house with space for the child.

{¶ 18} The magistrate issued a decision, recommending that the adoption proceed without the consent of the biological father. The biological father filed objections to the magistrate's decision; he subsequently also filed supplemental objections. On April 9, 2024, the trial court overruled the biological father's objections and adopted the magistrate's recommended decision. The trial court ordered that the petition for adoption of the child proceed without the consent of the biological father.

{¶ 19} The biological father filed a timely notice of appeal and raises one assignment of error for our review:

The trial court erred when it adopted the Magistrate's decision finding that father's consent was not required for the adoption where there was

clear and convincing evidence that father has failed without justifiable cause to provide de minimis contact and de minimis maintenance and support of the minor as this finding is against the weight of the evidence.

**Relevant Law**

{¶ 20} R.C. 3107.07(A) provides that consent to adoption is not required when

> [a] parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

{¶ 21} If a court determines that a parent has failed either "to provide more than de minimis contact with the minor" *or* "to provide for the maintenance and support of the minor as required by law or judicial decree" under R.C. 3107.07(A), the court must then consider whether that failure was "without justifiable cause." *In re A.K.*, 2022-Ohio-350, ¶ 26 (DeWine, J., concurring). The burden of proof is on the person seeking to adopt the child. *Id.* Thus, here, the prospective adoptive father had to show by clear and convincing evidence that the biological father failed to contact *or* support the child within the statutory time frame and that the failure was without justification. The court determined that because the petition for adoption was filed on June 30, 2021, the relevant look-back year was June 30, 2020, to June 30, 2021.

{¶ 22} R.C. 3107.07(A) operates only to determine whether an adoption may proceed without a biological parent's consent. *In re A.K.* at ¶ 12, citing *In re Adoption of Jorgensen*, 33 Ohio App.3d 207 (3d Dist. 1986). Its operation does not result directly in the adoption to which it relates. *In re A.K.* at *id.*, citing *In re Adoption of Jorgensen*. "[R.C. 3107.07(A)] only permits a court to proceed with the adoption and then only when [the court] finds after hearing that the adoption is in the best interest of the child [may it] enter[ ] a final decree of adoption." *In re A.K.* at *id.*, quoting *In re Adoption of Jorgensen* at 209.

{¶ 23} While this court reviews the probate court's finding that a parent failed to provide support for an abuse of discretion, "[w]hether justifiable cause has been proven by clear and convincing evidence is a separate issue the determination of which will only be reversed on appeal if it is against the manifest weight of the evidence." (Cleaned up.) *In re Adoption of S.G.L.*, 2024-Ohio-2248, ¶ 20 (9th Dist.). When addressing a manifest weight challenge, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Cleaned up.) *In re Adoption of S.G.L.* at *id.* When weighing the evidence, this court "must always be mindful of the presumption in favor of the finder of fact." *In re Adoption of S.G.L.* at *id.*, quoting *Eastley v. Volkman*, at ¶ 21. Notably, in this case, the jurist was the same since the inception of the case.

**{¶ 24}** Finally, a trial court is not restricted to focusing solely on the one-year statutory period in making its determination as to justifiable cause. *In the Matter of C.D.G.*, 2020-Ohio-2959, ¶ 15 (2d Dist.). Thus, "justifiable cause may be demonstrated by events either before or during the one-year period prior to the filing of the petition or a combination of both." *In re J.M.M.*, 2021-Ohio-775, ¶ 25 (3d Dist.).

**Duty to Support**

**{¶ 25}** The first step of our analysis is to determine "what the law or judicial decree required of the parent during the year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner." *In re Adoption of B.I.*, 2019-Ohio-2450, ¶ 15. Here the trial court found that there was no court order regarding the biological father's duty to pay child support.

**{¶ 26}** In *In re Adoption of B.I.*, the Ohio Supreme Court found that no separate obligation arises by law under which a parent is required to provide maintenance and support to the child if a trial court has issued a decree relieving a parent of any child-support obligation. *Id.* at ¶ 17. If there is a court order that states that a parent is not obligated to pay child support, then there is no separate duty under law for that parent to provide financial support. In other words, if a court order relieves the parent of paying for the maintenance and support of the child, the parent is completely relieved of the duty. Here, it is undisputed that the biological father was not under a court order to pay child support. Thus, we consider whether he was otherwise obligated under the law to support the child.

{¶ 27} "Under R.C. 3103.03, all parents, whether married or not, have a duty to support their minor children." *In re Adoption of B.I.*, at ¶ 21. This is true even in cases where the guardian does not express an interest in receiving financial assistance. *See In re Adoption of K.J.F.*, 2020-Ohio-977, ¶ 23 (3d Dist.) (holding that justifiable cause for failure to support under R.C. 3107.07(A) does not exist even if the child's legal custodian has not asked for financial assistance).

{¶ 28} Thus, in this case, the biological father had a duty to support the child, even in the absence of a court order or a request from the prospective adoptive father for support.

{¶ 29} The trial court found that father had not supported his child in the year preceding the filing of the petition to adopt. That finding is supported by both the biological father and the prospective adoptive father's testimonies that the biological father had not financially supported the child during the relevant time period or throughout the child's life.

{¶ 30} We next consider whether the father had a justifiable reason for not supporting his child. Because the biological father admitted that he has never supported the child, the burden of production shifts to him to "show some facially justifiable cause" for not supporting his child. *See In re Adoption of A.H.*, 2013-Ohio-1600, ¶ 12 (9th Dist.). To meet this burden, the biological father must produce evidence of his "entire financial situation," including the "types and amounts" of other obligations. *Id.* at ¶ 15.

{¶ 31} The biological father testified that he was an "essential worker," so he kept his job at a cell phone store during the pandemic. He was employed as a supervisor and earned both an hourly rate and commission. Both he and his brother, who worked with him, testified that the biological father's commissions fell during the pandemic, but there was no evidence presented regarding the amount his income decreased. Neither the father nor his brother testified or submitted evidence as to what the biological father's hourly pay or earnings were during the year prior to the filing of the petition.

{¶ 32} When a biological parent has some income but does not apply any of it to the child, this "weighs against a finding of justification." *In re Adoption of L.C.F.*, 2015-Ohio-1545, ¶ 19 (8th Dist.). The biological father testified that he was providing for other children in his case but failed to give any insight as to what his expenses were as to those children.

{¶ 33} The biological father relies on *In re S.L.P.*, 2020-Ohio-495 (8th Dist.), to support his claim that he could not afford to support his son and that petitioner did not ask for him to provide support. But in *In re S.L.P.*, the biological parent provided her tax returns to show her minimal income and, in addition, was consistent in giving gifts to her child. *Id.* at ¶ 7.

{¶ 34} Here, the biological father failed to give the trial court evidence of his finances to facially show justifiable cause. And, unlike the parent in *S.L.P.*, the biological father has failed to provide even de minimis support at any point during the child's life.

{¶ 35} The biological father failed to present evidence, other than generalizations about his reduced income, that show that he was unable to provide support during the statutory time period, or throughout the child's life. The biological father's vague testimony about his finances — especially with no overview of income and expenses — is insufficient to meet his burden.

{¶ 36} The limited evidence presented by the biological father about his ability to support his child did not demonstrate a facial justification for his failure to do so. Because the biological father did not meet his burden of going forward, the burden did not shift back to the prospective adoptive father to prove that the biological father's failure to support the child was not justified.

{¶ 37} Therefore, we conclude that the trial court's finding that the biological father failed to support his child within the year prior to the filing of the adoption petition was supported by clear and convincing evidence and was not against the manifest weight of the evidence.

**Duty to Communicate**

{¶ 38} R.C. 3107.07(A) is written in the disjunctive; therefore, either a failure to communicate or a failure to provide support for the one-year time period is sufficient to obviate the need for a parent's consent. *In re Adoption of A.H.*, 2013-Ohio-1600, at ¶ 9, citing *In re Adoption of McDermitt*, 63 Ohio St.2d 301 (1980). Thus, although our analysis could end with finding that the biological father had no justifiable reason for his failure to support his child, we will also consider whether the prospective adoptive father showed by clear and convincing evidence that the

biological father had no justifiable reasons for his failure to communicate with the child.

{¶ 39} The prospective adoptive father had the burden of proving by clear and convincing evidence that the biological father's failure to have contact with the child was without justifiable cause. *In re Adoption of D.W.-E.H.*, 2022-Ohio-528, ¶ 26 (8th Dist.), citing *In re Adoption of Bovett*, 33 Ohio St.3d 10 (1987). A probate court's justifiable cause decision will not be disturbed on appeal unless that determination is against the manifest weight of the evidence. *In re Adoption of D.W.-E.H.* at *id.*, citing *In re Adoption of M.B.*, 2012-Ohio-236.

{¶ 40} A trial court's factual findings must be given great deference on review because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections and use these observations to weigh the credibility of the proffered testimony. *In re Adoption of D.W.-E.H.* at ¶ 27, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984).

{¶ 41} The Ohio Supreme Court has found that "significant interference or significant discouragement" of communication may be justifiable cause for a noncustodial parent's failure to have contact with a child. *In re Adoption of D.W.-E.H.*, at ¶ 41, citing *In re Adoption of Holcomb*, 18 Ohio St.3d 361 (1985).

{¶ 42} Upon review of the record, the probate court had sufficient evidence to determine that the biological father did not have justifiable cause for his failure to have contact with the child for the year preceding the filing of the adoption petition.

{¶ 43} The biological father argued that he had justifiable cause for his failure to communicate with the child because he did not know where the child lived or how to contact him and because the prospective adoptive father and Mother substantially interfered with his ability to communicate.

{¶ 44} The biological father claims he tried to find the prospective adoptive father on social media but could not, Mother gave him incorrect phone numbers for the prospective adoptive father, and he did not know how to otherwise find the prospective adoptive father's address. He also claims he ran into the partner of prospective adoptive father at a bakery and the partner refused to give him any information on the child's whereabouts. The biological father did not testify to the date the supposed run-in occurred, or whether it occurred during the statutory look-back year.

{¶ 45} The biological father admitted his mother contacted him shortly after the child's birth and told him that the child was living with the prospective adoptive father. Additionally, his mother (the paternal grandmother) had the child in her home for a short period of time and she had visited the child in the prospective adoptive father's home. Thus, the biological father's mother knew where the child was located and visited the child, but the biological father did not try to visit the child or even ascertain his whereabouts.

{¶ 46} The biological father stated that the last time he saw his child was at the 2018 guardianship hearing. The biological father admitted he did not try to discuss visitation or contact information with the prospective adoptive father at that

hearing. The prospective adoptive father testified that he never kept the child from the biological father nor told anyone else to keep his location secret.

{¶ 47} The biological father has had no contact with the child during the statutory look-back year, or before or after that year. Despite the biological father's claims to the contrary, it is not the prospective adoptive parent's duty to contact the biological parent to see if he or she wants contact with the child; rather, it was the biological's father's duty to request contact with the child. The interference that the biological father claims prevented him from seeing his son — Mother giving him the wrong phone number, the prospective adoptive father blocking him on social media, and an unplanned run-in with petitioner's partner — do not amount to substantial interference with contact.

{¶ 48} We also find that the prospective adoptive father's testimony that his house was "closed" during the pandemic does not amount to substantial interference. There was no testimony about how long the prospective adoptive father kept people out of his home due to the pandemic. The relevant look-back period was from June 20, 2020, to June 20, 2021, and we note that Ohio's stay-at-home orders only lasted until May 29, 2020. It is unclear that the prospective adoptive father kept his home closed to visitors past that date; in fact, there was no testimony regarding dates at all, other than his house was closed "during the pandemic."

{¶ 49} This case is distinguishable from this court's decision in *In re Adoption of D.W.-E.H.*, 2022-Ohio-528 (8th Dist.), wherein the custodial parent,

the mother, blocked the father on social media and refused telephone contact with him.  In that case, this court upheld the probate court's decision that the father had a justifiable reason for failing to communicate with his child.  The trial court took into consideration the pandemic, father's medical condition, and that the child was conceived during an affair that took place at the home mother shared with the prospective adoptive father.  Likewise, in this case, we are deferring to the trial court's findings — herein, the court found no justifiable cause based on the specific facts of this case.

{¶ 50} There are several ways the biological father could have tried to contact the child.  The paternal grandmother knew where the child lived.  The biological father himself had visited the child previously, he just could not remember the address.  An excuse that he is not "close" to paternal grandmother and could not remember where the prospective adoptive father live are insufficient to justify his complete lack of communication with the child.

{¶ 51} Therefore, we conclude that the trial court's finding that the biological father failed to communicate with his child within the year prior to the filing of the adoption petition was supported by clear and convincing evidence and was not against the manifest weight of the evidence.

{¶ 52} The sole assignment of error is overruled.  Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

MICHAEL JOHN RYAN, JUDGE

LISA B. FORBES, P.J., and
ANITA LASTER MAYS, J., CONCUR